MARIANN BARTIMUS, Plaintiff-Appellee, *v.* PAXTON COMMUNITY HOSPITAL *et al.*, Defendants-Appellants—(C. R. Olaf *et al.*, Defendants)— MARIANN BARTIMUS, Plaintiff-Appellee, *v.* PAXTON COMMUNITY HOSPITAL *et al.*, Defendants (C. R. Olaf *et al.*, Defendants-Appellants).

Fourth District Nos. 4—82—0402, 4—82—0403 cons.

Opinion filed December 28, 1983.—Rehearing denied February 6, 1984.

Robert P. Moore and Robert A. Hoffman, both of Moore & Associates, of Champaign, for appellants Paxton Community Hospital and Ramona Cabebe.

Thomas, Mamer & Haughey, of Champaign (William J. Brinkmann, of counsel), for appellants C.R. Olaf and Richard P. Foellner.

Mort A. Segall and Charles K. Stowe, both of Segall Law Offices, of Champaign, for appellee.

JUSTICE MILLER delivered the opinion of the court:

Plaintiff brought an action in a four-count complaint to recover damages for injuries alleged to have been sustained by her as the result of negligent medical treatment by the defendants.

Count I of the complaint was directed against Paxton Community Hospital (PCH), alleging negligence in the operation of the hospital's emergency room. Count II was directed against Ramona Cabebe, a registered nurse employed by PCH on duty in the emergency room at the time plaintiff presented herself for treatment. Count III was directed against Drs. Olaf and Foellner, who are partners engaged in the practice of osteopathic medicine in Paxton. Plaintiff alleged that Dr. Olaf failed to render appropriate medical care and was negligent in diagnosing her condition. Count IV was directed against Jose Raquel, M.D., alleging that Raquel was negligent in subsequent surgeries performed by him on plaintiff. Dr. Raquel was granted summary judgment before trial and is not involved in this appeal.

Following trial, a jury returned a verdict against the defendants in the amount of $125,000. Judgment was entered on the verdict and defendants appeal from that judgment. For the reasons stated below, we reverse and remand for a new trial.

On February 27, 1978, Mariann Bartimus became ill with a bout of nausea and vomiting. Around 7 the following evening, she began having violent pain and had difficulty sitting up. Her husband drove her to PCH, arriving there about 8 p.m. Ramona Cabebe admitted plaintiff to the emergency room. Cabebe took plaintiff's medical history and blood pressure. Plaintiff contends that Cabebe asked plaintiff to give a urine sample, but that she was unable to comply. Cabebe denied asking for the sample. Cabebe then called Dr. Olaf, who had staff privileges at PCH and was "on call" as the emergency room physician that evening. Dr. Olaf was at home and did not come to the hospital.

Instead, he instructed Cabebe to give plaintiff an injection for pain and to tell plaintiff to come to his office at 8 the next morning. Olaf testified that, based on the information given him by Cabebe, he believed plaintiff had a urinary tract infection.

After returning home, plaintiff was still in pain and had difficulty sleeping. When she went to Olaf's office the next morning, Olaf's nurse took a brief history. On examination, Olaf found that plaintiff was having acute abdominal pain and decided to have her admitted to the hospital for tests. After receiving the results of plaintiff's blood test, Olaf called Dr. Raquel, who performed surgery on the plaintiff that morning.

Dr. Foellner testified that he assisted Raquel in performing surgery on plaintiff on the day she was admitted to the hospital. When plaintiff's abdomen was opened, Foellner saw that her appendix had ruptured and that infection had spread through her abdominal cavity and into her large and small intestines. The abdomen was irrigated, suction devices were used, and a tube was inserted to allow additional drainage. The incision was then closed around the tube which was removed several days later.

Plaintiff was discharged from the hospital on March 9, but returned on March 11 with a residual infection. Foellner and Olaf attempted to treat the infection with antibiotics but were unsuccessful. On March 13, Raquel performed a second surgery on plaintiff with Foellner and Olaf assisting. Two pelvic abscesses had developed. One was near plaintiff's umbilicus; the second was just above the bladder. The second surgery was necessary because all of the infection was not removed during the initial surgery. There is no evidence that Dr. Raquel failed to use due care during the first surgery; as stated earlier, Dr. Raquel was granted summary judgment on the count of plaintiff's complaint charging him with negligence.

Plaintiff was finally released from the hospital on March 25. Although she lost weight and was "weak" for at least a month following her discharge from the hospital, plaintiff stated that she did not have any permanent problems as a result of the surgery.

At trial, plaintiff contended that Ramona Cabebe, a nurse at PCH, failed to properly assess her condition when plaintiff presented herself at the emergency room on February 28, 1978, and that Cabebe failed to properly describe plaintiff's condition on that evening to Dr. Olaf. She further contended that PCH failed to provide her with proper emergency room care and that Dr. Olaf failed to adhere to appropriate medical and emergency room standards in failing to see plaintiff and in failing to properly diagnose her condition when she

appeared at the emergency room on the evening of February 28, 1978.

We are compelled to order a new trial in this case because of plaintiff's counsel's continued questioning of witnesses regarding alleged emergency room regulations contained in an emergency room manual, where that manual was never admitted into evidence by the trial court.

Plaintiff's counsel asked Marilyn Velasco, former director of nursing services at PCH, numerous questions which assumed the existence of a hospital regulation requiring every emergency room patient to be seen by a physician. Proof that such a regulation existed was never admitted into evidence in the trial court. Defendants' counsel made repeated objections to this line of questioning and those objections were, for the most part, sustained by the trial court. Despite the lack of proof that such a regulation existed at the time plaintiff came to PCH's emergency room, plaintiff's counsel continued to ask questions premised upon the existence of such a regulation.

█ Questions which are based upon or presume facts not in evidence are improper because the jury may assume that the presumed facts are true. Such questions may suggest to the jury that the witness adopts or admits the presumed facts. (See, *e.g., Pepe v. Caputo* (1951), 408 Ill. 321, 97 N.E.2d 260; *Gabosch v. Tullman* (1974), 21 Ill. App. 3d 908, 316 N.E.2d 226.) In *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353, the supreme court reversed Nuccio's conviction for murder and remanded the case for a new trial where the prosecutor continually made "substantial insinuations" regarding threats made by Nuccio or other police officers during his cross-examination of Nuccio, but no evidence to support the insinuations was ever presented to the trial court.

The principle outlined in *Nuccio* applies equally as well in a civil case. The questions asked by plaintiff's counsel over defendants' objections assumed facts not admitted into evidence which were relevant to a central issue in the case. We consider those questions to be improper under the circumstances described.

█ Similarly, where an attorney persistently attempts to introduce testimony or evidence previously ruled inadmissible, error is committed. (*Hires v. Price* (1966), 75 Ill. App. 2d 202, 220 N.E.2d 327; *Owen v. Willett Truck Leasing Corp.* (1965), 61 Ill. App. 2d 395, 209 N.E.2d 868.) *Hires* involved an action arising out of an accident involving two tractor-trailers. Despite the trial court's ruling on the exclusion of evidence concerning alleged threats made to one of plaintiff's witnesses, plaintiff's counsel, by persistent attempts, was able to

convey to the jury both the substance of the call and the identification of the caller. On appeal, this court found such conduct to be reversible error.

■ In the case before us, defendants were forced to object repeatedly to questions concerning the reasons for the termination of Nurse Cabebe's employment at PCH. Although the trial court had earlier in the proceedings ruled that the reasons for the termination of Nurse Cabebe's employment were inadmissible, plaintiff's counsel, through improper questioning, was nevertheless able to place the excluded evidence before the jury. As in *Hires*, we consider such conduct in the present case to be reversible error.

Since we are reversing the judgment and remanding the cause for a new trial because of the conduct of plaintiff's counsel at trial, it is not necessary that we address all of the alleged errors raised by defendants in their briefs. However, several key issues which will undoubtedly be present upon retrial require comment by this court.

In a medical malpractice action, plaintiff must show, through expert testimony, the standard of care applicable to the defendant physician. Furthermore, plaintiff must show, by competent and affirmative evidence, that the physician breached the applicable standard of care and that this breach resulted in injury to the plaintiff. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Ybarra v. Cross* (1974), 22 Ill. App. 3d 638, 317 N.E.2d 621.) Defendants contend that Dr. Procell, plaintiff's expert witness, was not qualified to testify regarding the standard of care to which Olaf and Foellner are to be held because (1) Procell was not familiar with the standard of care applicable to physicians in the Paxton area or in other similar communities and (2) Procell was not an osteopath.

Dr. James Procell testified as plaintiff's medical expert. Procell is a medical doctor. He participated in a residency in family practice and was formerly employed as an emergency room physician at Carle Foundation Hospital in Urbana from 1975 to 1980. He left Carle in 1980 and at the time of trial, he had not practiced medicine for a period of over one year.

Dr. Procell testified that, in his opinion, the care plaintiff received in the emergency room was not in accordance with "minimum" standards of care and that this deviation from the accepted standard of care resulted in injury to the plaintiff.

Procell was critical of Dr. Olaf because Olaf did not see plaintiff in the emergency room. He stated that he did not know the standard of care in effect at PCH, but stated that, according to a "minimum standard across the country," plaintiff should have been seen by a

physician. Procell stated that where a physician does not know a patient and has no experience in treating that patient, that patient should be seen by the physician. In Dr. Procell's opinion, plaintiff's appendix perforated sometime between 8:30 p.m. on February 28 and 8 the following morning. He based this opinion upon plaintiff's temperature readings and white blood cell count.

Procell admitted he had never been to PCH and knew nothing about their facilities. He explained that his answer with respect to deviations from the "minimum standard of care" related primarily to the doctor. Procell admitted that he had never worked in an emergency room in a small hospital similar to PCH. He had never worked in an emergency room where a doctor was not present at all times. He admitted that he had given telephone orders based upon information given to him by an emergency room nurse.

The "locality rule" as applied in medical malpractice cases has a long and tortured history. The notion that a physician should be held to the standard of care existing in the physician's own community was developed by American courts in the 19th century to protect the rural practitioner, who was presumed to have less education and less access to adequate facilities and equipment than a physician practicing in a large urban area. See, *e.g., Smothers v. Hanks* (1872), 34 Iowa 286; *Hathorn v. Richmond* (1876), 48 Vt. 557; Annot., 99 A.L.R.3d 1133 (1980).

Several problems with the strict application of the locality rule became apparent to both the courts and the commentators. First, application of the rule in a strict fashion could act to deny an injured plaintiff recovery where his treatment was clearly negligent although consistent with the practices prevailing in his community. Second, a "conspiracy of silence" among physicians in a community could deny a plaintiff expert medical testimony necessary to his case. Waltz, *The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation*, 18 De Paul L. Rev. 408 (1969); Note, 1969 U. Ill. L.F. 96.

In response to the shortcomings of the strict locality rule, courts developed a less stringent rule whereby a physician's conduct is judged by the standard of care of a reasonably competent physician practicing in the same or similar communities. (See, *e.g., Walls v. Boyett* (1950), 216 Ark. 541, 226 S.W.2d 552; *Chandler v. Neosho Memorial Hospital* (1977), 223 Kan. 1, 574 P.2d 136; *Callahan v. William Beaumont Hospital* (1976), 67 Mich. App. 306, 240 N.W.2d 781, *aff'd* (1977), 400 Mich. 177, 254 N.W.2d 31; *Larsen v. Yelle* (1976), 310 Minn. 521, 246 N.W.2d 841; *Little v. Cross* (1976), 217 Va. 71, 225 S.E.2d 387.) While this standard helps alleviate, to some degree,

problems associated with the reluctance of physicians to testify against a colleague practicing in their community, it does not remedy the other potential problem: a rural practitioner being held to a lesser standard of care than his urban counterpart.

In recent years, several jurisdictions have abrogated the locality rule entirely on the premise that, given modern methods of communication and transportation and the widespread availability of sophisticated equipment and technology, no justification exists for distinguishing between physicians based upon the location of their practice. Instead, these courts have determined that a physician should be held to the standard of care of a reasonably competent physician acting under the same or similar circumstances regardless of locality. See, *e.g.*, *Shilkret v. Annapolis Emergency Hospital Association* (1975), 276 Md. 187, 349 A.2d 245; *Brune v. Belinkoff* (1968), 354 Mass. 102, 235 N.E.2d 793; *Shier v. Freedman* (1973), 58 Wis. 2d 269, 206 N.W.2d 166; Annot., 99 A.L.R.3d 1133 (1980).

Illinois courts have not chosen to follow the strict locality rule or to abandon the locality rule altogether, but have chosen rather to apply the "similar locality" rule in determining the standard of care applicable to a physician. *Schireson v. Walsh* (1933), 354 Ill. 40, 187 N.E. 921; *Hirn v. Edgewater Hospital* (1980), 86 Ill. App. 3d 939, 408 N.E.2d 970; *Taber v. Riordan* (1980), 83 Ill. App. 3d 900, 403 N.E.2d 1349; see also Illinois Pattern Jury Instruction (IPI), Civil, No. 105.01 (2d ed. 1971).

■ In the case at bar, it was incumbent upon the plaintiff to lay a proper foundation to support the admission of the testimony of his expert witness, Dr. Procell. Plaintiff failed to lay this foundation. Dr. Procell indicated that he had only practiced medicine in large urban areas. He admitted having no familiarity with medical practice in Paxton or similar communities. He also admitted that he had never worked in the emergency room of a hospital where the physicians were "on call," as was the case at PCH. Finally, he testified in terms of a "national standard" of care by which a physician's conduct is judged. Since plaintiff failed to show that Dr. Procell had any familiarity with medical practice in Paxton or a similar community or in a hospital similar to PCH, the admission of Dr. Procell's testimony was error.

Defendants further maintain that Dr. Procell was not competent to testify regarding the standard of care applicable to Dr. Olaf and Dr. Foellner, because he was not a licensed osteopath.

Our supreme court adopted the so-called "school of medicine" doctrine with respect to medical experts in *Dolan v. Galluzzo* (1979), 77

Ill. 2d 279, 396 N.E.2d 13. In *Dolan*, plaintiff brought a malpractice action against a podiatrist for an alleged negligent osteotomy. Defendant made a motion *in limine* to prevent plaintiff from introducing the testimony of an orthopedic surgeon on the issue of the duty of care owed by a podiatrist to his patient. The trial court granted the motion *in limine* and permitted plaintiff to take an interlocutory appeal. The appellate court affirmed the circuit court and plaintiff obtained leave to appeal to the supreme court.

The supreme court vacated and remanded, holding that in order for a person to testify as to the standard of care in a given school of medicine, the witness must be licensed in that school. The court stated that the law recognizes different schools of medicine, but does not favor one school over another. Since the different schools have differing methods of treatment and practice, the court concluded, it would be inequitable to have the conduct of a duly licensed practitioner of one school judged by the standards of a different school of medicine.

The court vacated the trial court's order and remanded the case because the order *in limine* was overbroad in that it would bar testimony by a physician who was also a licensed podiatrist. The court set forth a two-part test for the admission of expert testimony in a medical case. First, the party offering the expert testimony must establish that the witness is licensed in the school of medicine to which the defendant belongs. Once that has been established, it is within the discretion of the trial court to decide if the witness is otherwise qualified to give expert testimony on the case. The court stated, however, that a physician could offer competent testimony as to his diagnosis of plaintiff's present condition and the prognosis for recovery regardless of the school of medicine to which the defendant subscribes.

*Dolan* involved the propriety of allowing an orthopedic surgeon to testify as to the standard of care owed by a podiatrist to his patient. The court noted that the legislature recognized different "schools" of treatment in providing for separate licensing requirements for various health professionals. (See Ill. Rev. Stat. 1981, ch. 111, par. 3401 *et seq.*) In the case at bar, we are faced with a somewhat different question: the propriety of an allopathic (M.D.) physician testifying as to the standard of care owed to a patient by an osteopathic physician.

Under the Medical Practice Act (Ill. Rev. Stat. 1981, ch. 111, par. 4401 *et seq.*), both allopaths and osteopaths are eligible to receive a license to practice medicine in all its branches. (Ill. Rev. Stat. 1981, ch. 111, par. 4421(1).) The fact that both allopaths and osteopaths receive the same license under the Medical Practice Act distinguishes

this case from *Dolan,* where a physician attempted to testify regarding the standard of care of a podiatrist. Podiatrists are not licensed under the Medical Practice Act. Podiatrists are licensed under the provisions of "An Act to regulate the practice of podiatry in the State of Illinois" (Ill. Rev. Stat. 1981, ch. 111, par. 4901 *et seq.*).

■ The general rule developed by the supreme court in *Dolan* protects those professionals licensed in one legislatively designated "school of medicine" from having their methods of treatment judged by a professional licensed in another legislatively designated "school of medicine." *Dolan* encourages the diversity of choice of medical treatment which the legislature has authorized by the enactment of the various professional licensing statutes, including the Medical Practice Act. However, where the professionals involved are licensed under the same statute, even though the philosophies underlying their respective methods of treatment may differ in some respects, the principles advanced by *Dolan* are not threatened. Therefore, we hold that an allopathic physician can qualify, under the first part of the licensing portion of the two-part test set forth in *Dolan,* as an expert as to the standard of care owed to a patient by an osteopathic physician.

Before such testimony would be admissible, however, the second part of the *Dolan* test must be met. The party offering the testimony must offer a sufficient foundation that the expert has knowledge acquired through training, education, experience or the like, of the standard of care owed to his patient by the osteopath-defendant.

■ Defendants are incorrect, however, in seeking to apply the *Dolan* "school of medicine" approach to the determination of the standard of care applicable to PCH. In *Greenberg v. Michael Reese Hospital* (1980), 83 Ill. 2d 282, 415 N.E.2d 390, our supreme court refused to extend the *Dolan* rule to a case involving hospital negligence.

In *Greenberg,* the hospital was sued in negligence and strict liability for injuries resulting from X-ray therapy. The trial court granted summary judgment to defendant hospital and the supreme court reversed and remanded for further proceedings. Defendant argued that since plaintiff's expert was a health physicist and thus not a member of any school of medicine, *Dolan* made his testimony inadmissible regarding conduct which was in the nature of a medical judgment. The supreme court rejected the defendant's claim that *Dolan* was applicable to hospital negligence, basing its decision on the fact that a hospital is made up of a variety of professionals, not all of whom are licensed medical practitioners, and that a hospital has functions which

are not strictly medical in nature.

Finally, defendants have raised several issues concerning instructions submitted by plaintiff and given over defendants' objections and instructions submitted by defendants but refused by the trial court. Since we are remanding this case for a new trial, we will briefly discuss the alleged errors in the instructions given by the trial court.

Defendants contend that the trial court erred in instructing the jury that plaintiff could recover damages for future pain and suffering. Plaintiff's instruction 8 contained the language "[t]he pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries." This portion of the instruction is taken verbatim from IPI Civil No. 30.05 (2d ed. 1971).

██ The trial court erred in giving this instruction. In order for an instruction on future pain and suffering to be proper, there must be evidence in the record that such pain and suffering is reasonably certain to occur in the future. (*Jurney v. Lubeznik* (1966), 72 Ill. App. 2d 117, 218 N.E.2d 799; IPI Civil No. 30.05 (2d ed. 1971).) Plaintiff testified that she had not experienced any problems after her recuperation from the surgeries. Plaintiff's expert, Dr. Procell, was unable to say, with a reasonable degree of medical certainty, that plaintiff would experience any future medical problems as a result of the rupture of her appendix. The record does not contain any evidence which would support this instruction.

██ The trial court did not err by refusing to give defendant's instruction 5 on comparative negligence. Defendant's instruction 5 states, in part:

> "It was the duty of the plaintiff before and at the time of the occurrence, to use ordinary care for her safety. That means it was the duty of the plaintiff to be free from contributory negligence."

It is at least arguable from the evidence presented that plaintiff may have failed to use due care in leaving the hospital on March 9, 1978, against the advice of Dr. Olaf. This evidence, although slight, was sufficient to support the trial court's decision to instruct the jury on comparative negligence.

However, defendant's instruction does not correctly state the law as it exists after *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886. Defendant's instruction is patterned after IPI Civil No. 10.03 (2d ed. 1971), used before *Alvis*, with an attempted modification to bring it into line with the rules of comparative negligence. IPI Civil No. A10.03 (Supp. 2d ed. 1981) is the correct instruction to give in a comparative negligence situation. It states:

"It was the duty of the plaintiff, before and at the time of the occurrence, to use ordinary care for [his own safety] [and] [the safety of his property]. The failure of a plaintiff to use ordinary care [for his own safety] [or] [for the safety of his property] is known as contributory negligence.

Plaintiff's contributory negligence, if any, does not bar his recovery. However, the total amount of damages to which he would otherwise be entitled is reduced in proportion to the amount of his negligence. This is known as comparative negligence."

The Comment to IPI Civil No. A10.03 states that 10.03 was changed because it is no longer true that plaintiff has a duty to be free from contributory negligence. The trial court did not err in refusing defendant's instruction 5.

The instruction states that the duty of PCH was to provide "Standby Emergency Services" by having a registered nurse available, and a licensed physician "on call," to the emergency room at all times. *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, holds that such regulations can be evidence of the standard of care applicable to a hospital, but are not conclusive on that issue. Because the duty of the hospital to the plaintiff was not limited to having a registered nurse available, and a licensed physician "on call" to the emergency room at the time plaintiff presented herself for treatment, the tendered instruction was misleading in the sense that it did not fully set forth the duty of the hospital to the plaintiff.

Defendants Olaf and Foellner's instruction 7 on mitigation of damages by plaintiff was also refused by the trial court. The instruction was IPI Civil No. 33.01 (2d ed. 1971); the notes to this section state that the instruction should never be given unless "(1) there is evidence creating an issue of fact as to the plaintiff's negligence in securing medical attention, and (2) the damages resulting to the plaintiff from the failure to exercise due care in obtaining medical care are separable from his other injuries."

■ We are of the opinion that the trial court properly refused defendant's instruction 7. There is no evidence in the record to support the conclusion that plaintiff's purported failure to secure medical treatment in a timely manner enhanced her injuries. The hospital and plaintiff's physicians took plaintiff as they found her. The fact that a delay in treatment may have initially worsened her condition does not mitigate damages arising from a failure to properly diagnose and treat that worsened condition when plaintiff presented herself for

treatment on February 28, 1978.

For the reasons stated, the judgment of the circuit court of Champaign County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

MILLS, P.J., and TRAPP, J., concur.