WILLIAM J. CASSADY, Plaintiff-Appellant, v. JON HENDRICKSON *et al.*, Defendants-Appellees.

Fourth District   No. 4—85—0258

Opinion filed December 6, 1985.

Alfred H. Kreckman, Jr., of Massey, Anderson & Gibson, of Paris, for appellant.

Todd M. Tennant, of Dobbins, Fraker, Tennant, Joy & Perlstein, of Champaign, for appellees.

JUSTICE TRAPP delivered the opinion of the court:

Plaintiff, William Cassady, appeals an order of the circuit court of Champaign County, granting summary judgment in defendants' favor. We reverse and remand.

This cause involves a medical negligence action brought against Dr. Jon Hendrickson, medical office assistant (MOA), Loretta Strode, and their employer, the Carle Clinic Association (Clinic). Plaintiff essentially alleges that: Strode punctured his rectum during the administration of a cleansing enema; Hendrickson, a radiologist, failed to appropriately respond after discovery of the problem, causing a delay in treating plaintiff; the Clinic was responsible for the actions of its employees; and Strode and the Clinic were negligent under a theory

of *res ipsa loquitur*. Plaintiff also alleges that defendants did not adequately inform him about the risks of the procedure. However, on appeal plaintiff concedes this issue. Grievous injury resulted from the puncture and subsequent infection.

On January 9, 1985, the circuit court granted defendants' motion for summary judgment. It found that plaintiff's medical expert was not qualified to render opinion testimony on the appropriate standard of care and that plaintiff could not establish his *res ipsa loquitur* theory because evidence indicated that the puncture could have been caused by a rectal defect. Therefore, it found no material issues of fact existed, and defendants were entitled to judgment as a matter of law.

We reverse and remand.

The facts are prolix but will be summarized only as necessary to an understanding of our disposition.

THE EVENTS

On September 21, 1981, plaintiff underwent a physical examination conducted by Dr. John Houseworth, a board certified internist, at the Clinic's offices in Champaign. The Clinic is a physicians' group practice organization. Houseworth stated that plaintiff was a 69-year-old male whose primary complaint was emphysema. Plaintiff did not have any complaints concerning his bowels or rectum. Houseworth did not find any rectal abnormalities. However, hemoglobin test results revealed blood in the stool. Therefore, Houseworth recommended a proctoscopic examination and colon X ray.

Plaintiff stated that he reported to the enema department for a cleansing enema prior to the proctoscopic examination. He did not experience any difficulty during the enema procedure. He was not advised of any risks concerning the procedure. After the cleansing enema, plaintiff reported to Dr. Julius Bonello, a board certified colon and rectal surgeon, who conducted a proctoscopic examination.

Bonello stated that his September 21, proctoscopic examination did not reveal any abnormalities. Bonello inserted the proctoscope approximately 20 centimeters (between seven and eight inches). There were no visible soft or weak spots. The examination would have revealed such areas if they were secondary to visible rectal abnormalities. Bonello did not discover the cause of the positive reaction to the hemoglobin test.

Plaintiff returned to the Clinic on October 1, 1981, for a barium X ray of his colon and other tests. Prior to the barium X ray, plaintiff underwent two cleansing enemas. At the start of the first enema, im-

mediately after insertion of the enema catheter tip, plaintiff felt a sharp pain. He told Strode, the MOA giving the enema, that he was in pain. Strode did not verbally respond. She paused, then pushed the catheter tip in further, causing additional pain. Plaintiff informed her of the additional pain.

Plaintiff further stated that Strode continued the enema. The fluid felt as if it were coming into his abdomen. Plaintiff screamed, telling Strode that she was hurting him. After completion of the first enema, plaintiff had difficulty getting off the table, was in severe pain, was disoriented, and could not evacuate the enema fluid. Plaintiff informed Strode that he was in pain and had difficulty moving. She administered the second enema.

Strode stated that she distinctly remembered administering enemas to plaintiff on October 1, 1981. She visually checked the enema catheter tip, a piece of hard plastic about five inches long, adding additional lubricant to it. She inserted the tip approximately 2½ inches without any difficulty. Nothing unusual happened. Plaintiff did complain of pain after infusion of approximately 200 to 300 cc's of fluid. Strode believed the discomfort was due to cramping. She slowed the infusion rate and administered the balance of the enema. Plaintiff did not complain during the second enema. He did say his rectum felt swollen. When she escorted him to the fluoroscopy department, plaintiff did not seem to be experiencing any discomfort or pain.

Plaintiff stated that after the cleansing enema procedure he was unable to stand straight, walked bent over, held his stomach, was in extreme pain, and was disoriented. Plaintiff also told the barium X-ray technician that he was in pain.

Strode stated that she learned how to administer enemas during nurse's aid training and through on-the-job training at the Clinic and a local hospital. The procedure is routine. She administers several enemas of this type daily.

Jona Franklin, the barium X-ray technologist who assisted plaintiff on October 1, stated that she did not notice any indication that plaintiff was in pain or in distress. She inserted the barium enema catheter tip approximately two to three inches. Hendrickson arrived and started the barium X ray. He switched the barium off almost immediately, ordering Franklin to obtain additional X rays. Although Franklin could not remember specifics about plaintiff's physical appearance or condition on October 1, she remembered that he did not have any difficulty moving. She did not remember blood on the enema catheter tip or Hendrickson saying anything to plaintiff after he turned on the fluoroscope.

Hendrickson stated that he is a board certified radiologist. He started the X-ray procedure at approximately 8 a.m. Because he noted the extravasated barium (barium outside the intestinal tract), Hendrickson turned the barium off almost immediately and took X rays of the area. He ordered additional X rays, telling plaintiff about his findings in Franklin's presence.

Hendrickson further stated that he telephoned Houseworth, who indicated that he would see plaintiff that afternoon and would contact Bonello, a surgeon. Plaintiff appeared stable, without any unusual pain or difficulty in movement. Hendrickson spoke with him approximately four times, before authorizing plaintiff's release from the fluoroscopy department, 80 minutes after the procedure. Normally, patients are released after five minutes. Hendrickson admitted that he did not conduct a physical or take plaintiff's vital signs. He thought his duty was to observe plaintiff and report the problem to Houseworth. Plaintiff stated that Hendrickson did not tell him anything or ask any questions. After he arrived at the cafeteria, he ate some breakfast, then fainted.

Jan Melton, a nurse at the Clinic and Strode's supervisor, stated that she was called to the cafeteria to assist plaintiff, who was awake and sitting at a table when she arrived. Plaintiff was very weak and complained of low abdominal pain. She brought plaintiff back to the X-ray department on a gurney.

Houseworth stated that he is a board certified internist. Bonello was in surgery when he tried to contact him on October 1. Houseworth did not give Hendrickson any instructions and thought plaintiff's condition was a surgical problem. After plaintiff fainted, Houseworth came to the X-ray department and decided to hospitalize him. Plaintiff appeared clinically stable. Therefore, Houseworth did not consider plaintiff's condition an emergency situation at that time. Later, he concluded surgery was necessary to save plaintiff's life.

Bonello saw plaintiff at noon on October 1, 1981. Plaintiff was complaining of lower abdominal pain, but Bonello thought objectively plaintiff did not appear seriously ill. Later that evening, plaintiff's condition had deteriorated, becoming an emergency situation. Bonello conducted a proctoscopic examination at approximately 9:30 p.m. and observed a circular perforation six to 10 centimeters (three to five inches) above the anal orifice. The perforation was $1/8$ to $1/2$ inch in diameter and within the normal range in which an enema catheter tip would be inserted. The subsequent surgery revealed plaintiff has a massive, fulminating infection which rendered him critically ill, requiring further surgeries and resulting in multiple complications.

## Expert Testimony

### Enema Procedure

Defendants named themselves and Drs. G. Bruce Thow and Thomas Cusack as experts. Plaintiff named Dr. David McAfee as expert.

Strode testified that the Clinic had a written procedure for enema administration, which was posted on the bulletin board of the enema department. She had been instructed to observe her patients for abdominal cramping, faintness, vomiting, and nausea. If the symptoms were something she could not handle, she was told to contact a supervisor. The enema catheter tip should be inserted slowly and gently. Strode stated that punctures and scratching were risks if an enema was not properly administered. Strode admitted that if the rectum were perforated, fluid could flow into adjacent areas.

Melton testified that she received training in enema administration and was experienced in administering enemas. To a reasonable degree of nursing certainty Strode followed the accepted procedure in administering cleansing enemas to plaintiff on October 1. Melton stated that the Clinic barium enema preparation procedure was the accepted procedure for administering enemas. It was the procedure used locally and a proper procedure. Essentially the same procedure was followed in all of the hospitals at which she had worked.

Melton instructs nurse's aids to contact her if the patient gets faint, weak, has problems with bleeding or the administrator has difficulty in inserting the enema catheter tip. The nurse's aid should report to a supervisor if a person complains of sharp pain when the catheter tip is inserted. If the person is unable to evacuate the fluid, the nurse's aid should notify her supervisor. Absent hemorrhoids, complaints of a swollen rectum should be reported to the supervisor. Difficulties in ambulation, disorientation, and confusion, if not present before the procedure, should be reported to a supervisor.

Bonello testified that he was certain the perforation was caused by either the cleansing or barium enema. However, he could not state exactly how the instant injury occurred because he was not there. The injury could have occurred during a properly administered enema. Among the risks of the procedure are scratches and perforations.

Bonello stated that he did not know whether the Clinic had instructions on enema administration in 1981. However, he taught how cleansing enemas should be given. Gentleness is important in the procedure. Bonello further stated that a portion of the sigmoid colon, above the injury site, showed edema, which was caused by the surgery and chronic focal inflammation of the submucosa layer. Bonello

thought the inflammation was not a response to the surgery. However, it could have been a response to the massive infection and peritonitis which developed after the perforation. The inflammation also could have been preexisting.

Hendrickson testified that the procedure for administering a barium enema is very similar to the procedure for administering a cleansing enema. One stops if one encounters abnormal pain or resistance. Hendrickson could not say a perforation could not occur during a properly administered enema.

Cusack stated that he is a board certified diagnostic radiologist, and is familiar with the standards of care in downstate Illinois as they pertain to radiologists and enema administration. The enema administration procedure is standard throughout the area, although there is variance as to the amount of fluid infused and whether the hospital has the patient administer the enema at home. Cusack stated a procedure identical to that stated by Bonello, Strode, Thow, and Melton. In Cusack's opinion the Clinic procedural protocol comported with the medically accepted standard of care.

Cusack noted that gentleness in inserting the enema catheter tip is important. Normally the rectum is quite strong. Insertion of an enema catheter tip is within the normal range of pressure. A major risk in the procedure is encountering a person with a preexisting defect which would rupture. Other risks include aggravation of a defect, tissue damage, and perforations. Perforations are extremely uncommon when enemas are properly given; however, a risk of perforation exists even during a properly administered enema.

Cusack further stated that he suspected a rectal abnormality in the instant case because of the perforation. He noted that a pathology report of the sigmoid colon suggested a rectal problem, because it showed focal chronic inflammation of the submucosa layer (layer of tissue immediately underneath the lining) of the intestine. However, Cusack admitted there was no evidence of any anatomical abnormality in the rectum. Plaintiff's lack of symptoms and the results of Bonello's September 21, proctological examination militated against a preexisting problem.

Although Cusack believed the perforation did not occur after the cleansing enemas on October 1, 1981, he did not form an opinion on whether Strode deviated from the standard of care. Franklin did not. A person administering an enema should check with her supervisor if she encounters unusual complaints of pain; however, complaints are the usual event during enema procedures, especially among older persons. Forceful insertion of an enema catheter tip could perforate the

rectal wall and not be negligent. A perforation can occur when the procedure is properly carried out. A perforation occurring during the cleansing enema would be painful, and the patient would experience pain from the fluid flowing into other areas.

G. Bruce Thow stated that he is a board certified colon and rectal surgeon. The Clinic is the largest group physician practice in Illinois, and it was fortunate that plaintiff was treated at a major medical center. The Clinic is one of 25 nationally and internationally recognized centers for treating colon and rectal diseases. In order to become a national center, it had to have board certified specialists, an institution with affiliated medical and surgical specialties, a library, university affiliations, scholarly activity, and be reviewed by the residency review board. A second review of procedures by a different national group must also be passed. Traumatic colon injuries, including plaintiff's type injury, are within its specialty.

Thow testified that the Clinic enema administration procedure incorporated the usual accepted procedure. Usually, the procedure is conducted by nonmedical personnel. Gentleness in inserting the enema catheter tip is always appropriate. Based upon his review of Strode's deposition, she did not deviate from the standard of care in administering cleansing enemas to plaintiff on October 1, 1981. However, Thow did not have an opinion to a reasonable degree of medical certainty on the cause of the perforation. He stated that it would be extremely difficult to perforate a normal rectum. It would be easier if the rectum were abnormal. A pathology report of the sigmoid colon (six to 12 inches from the rectum) was evidence of a diseased rectum. Intestinal diseases tend to be continuous. A ruptured diverticulum could also have caused the perforation and been missed in the September 21 examination.

Thow discounted plaintiff's complaints of pain. Normal distention of the colon produces pain. However, no acute pain can be felt between four and eight centimeters into the rectum. Plaintiff's perforation occurred above the acute pain zone. Therefore, perforation of the rectum itself could not have been painful. However, perforation of the peritoneal cavity would cause pain. Thow admitted that perforation of the anterior wall of the rectum and into the peritoneum at the level of plaintiff's perforation would cause pain. The resultant infection would not be painful for several hours.

David McAfee stated that he is a board certified general surgeon. McAfee admitted that he was not familiar with the medical community, specialties or facilities in Champaign-Urbana or other stated Illinois communities. His opinions were based upon a national standard

of care, which he felt applied in the instant case. He was not a radiologist or trained in radiology. However, he had experience in colon and rectal surgery, the enema procedure, and treatment of bowel diseases. All defendants failed to comply with the national standards of care.

## POST-DISCOVERY CARE

Cusack stated that barium outside the rectum could indicate a disaster but could also be innocuous. It was never a normal finding. The accepted radiological standard of care is to recognize the problem, contact the clinician involved, and render emergency treatment if needed. If no emergency exists, the radiologist should not treat the problem. Cusack believed that plaintiff's condition became an emergency situation after his collapse in the cafeteria. Accepting Hendrickson's assessment of plaintiff's condition, Hendrickson complied with the standard of care. Hendrickson observed plaintiff, who did not appear clinically to be in distress, while in the X-ray department and contacted the treating physician. Complaints of pain are normal especially from older people.

Thow testified that plaintiff's condition warranted an immediate proctological examination and necessary treatment. Bonello and Houseworth deviated from the standard of care by not conducting an immediate proctological examination and by delaying necessary treatment. Hendrickson complied with the standard of care. Hendrickson stopped the barium X ray immediately, called plaintiff's treating physician, and observed plaintiff. After the call, Thow thought plaintiff was Houseworth's responsibility. It was reasonable for Hendrickson to release plaintiff to the cafeteria since plaintiff was stable. However, Thow admitted that if plaintiff were in pain or having difficulty, he should have been kept in the X-ray department.

## SPECIFIC NEGLIGENCE

Applying the same- or similar-community standard, the trial court granted defendants' summary judgment motion. It concluded that there was an inadequate foundation in the record to permit plaintiff's expert to testify as to the applicable standards of care and breach of the standards of care. The trial court based its decision on *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072. Plaintiff argues that defendants' experts established the standards of care and material issues of fact exist as to whether defendants' actions complied with those standards.

■ We agree. Defendants' experts' testimony and the Clinic procedural protocol established the applicable standards of care in the in-

stant case. Therefore, we do not reach the propriety of the trial court's ruling on McAfee's qualifications as an expert or its application of *Bartimus*.

■ Generally, in a medical negligence action, plaintiff must establish by expert testimony the standard of care against which defendant's conduct should be measured. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 381 N.E.2d 279; *LeBrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 471, 473 N.E.2d 1322, 1332; *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072; *Smith v. St. Therese Hospital* (1982), 106 Ill. App. 3d 268, 273, 435 N.E.2d 939, 942.) Plaintiff must then show by affirmative evidence that defendant's conduct was negligent in light of that standard, and the negligence caused injury. *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *LeBrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.

Plaintiff may rely upon defendants and their experts' testimony in establishing the applicable standard of care. (*Metz v. Fairbury Hospital* (1983), 118 Ill. App. 3d 1093, 1097, 455 N.E.2d 1096, 1100; *Anderson v. Martzke* (1970), 131 Ill. App. 2d 61, 65, 266 N.E.2d 137, 139.) A written procedure or explicit instructions from a drug manufacturer is evidence of the standard of care. (*Ohligschlager v. Proctor Community Hospital* (1973), 55 Ill. 2d 411, 417, 303 N.E.2d 392, 396; *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253; *First National Bank v. Porter* (1983), 114 Ill. App. 3d 1, 448 N.E.2d 256.) Defendant doctor is held to that degree of skill, knowledge, and care exercised by a good practitioner in the same or similar community. (*Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072; *Hirn v. Edgewater Hospital* (1980), 86 Ill. App. 3d 939, 408 N.E.2d 970.) However, if only one standard of care exists, the national standard and the community standard are the same. *Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 443 N.E.2d 774.

Summary judgment is appropriate in a medical negligence case. (*Thompson v. Webb* (1985), 138 Ill. App. 3d 629; *Bennett v. Raag* (1982), 103 Ill. App. 3d 321, 326, 431 N.E.2d 48, 51.) Summary judgment should be granted only when the pleadings, depositions, admissions, and affidavits show that there is no genuine issue as to a material fact and that the movant is entitled to judgment as a matter of law. (*Thompson v. Webb* (1985), 138 Ill. App. 3d 629; *Nelson v. Gundlock* (1983), 120 Ill. App. 3d 117, 120-21, 457 N.E.2d 1052, 1054; *Smith v. St. Therese Hospital* (1982), 106 Ill. App. 3d 268, 435 N.E.2d 939.) The record must be interpreted strictly against the movant and

in favor of the nonmovant. The right of the moving party must be free from doubt. *Prather v. Decatur Memorial Hospital* (1981), 95 Ill. App. 3d 470, 472, 420 N.E.2d 810, 811.

Defendants and their experts agree that the Clinic enema administration protocol encompassed and comported with the standard of care for enema administration. All agree gentleness when inserting the enema catheter tip is appropriate. If plaintiff's statement is accepted as true, an issue of fact exists as to whether Strode breached the standard of care by forcefully inserting the enema catheter tip. In ruling on a summary judgment motion, the trial court should interpret the evidence strictly in favor of the nonmovant. *Prather v. Decatur Memorial Hospital* (1981), 95 Ill. App. 3d 470, 420 N.E.2d 810.

Additionally, defendants and their experts stated that the procedure should be discontinued and the MOA should contact a supervisor if unusual pain occurs, unusual resistance is met, the patient cannot evacuate the fluid, the patient faints, is disoriented or has unusual difficulty in walking after the procedure. Plaintiff here stated that he was disoriented, in extreme pain, had difficulty walking, and could not evacuate the enema fluid. An issue of fact exists as to whether Strode complied with the standard of care by continuing the procedure without contacting her supervisor.

Cusack, Thow, and Hendrickson agree that extravasated, leaking barium is an unusual problem and calls for treatment. Cusack and Thow stated that if an emergency exists, the radiologist should initiate treatment. If no emergency situation exists, it is appropriate to wait for the clinician.

Thow stated that releasing plaintiff from the X-ray department would not be appropriate if plaintiff were in distress. Thow also stated that immediate examination was warranted. Hendrickson admitted that he did not examine plaintiff or take his vital signs. Cusack and Thow agreed that Hendrickson complied with the standard of care. However, their opinions were premised upon the assumption that plaintiff was not in distress and clinically stable. The specific testimony and events which occurred on October 1, suggest that an emergency situation existed and contradict Thow's and Cusack's opinions. Plaintiff's testimony indicates an emergency situation existed. Plaintiff's rapid physical deterioration and the progress of his infection support this assessment. An issue of fact exists as to whether waiting for the clinician and releasing plaintiff from the fluoroscopy department were in compliance with the standard of care. Since we find specific issues of fact exist, the trial court erred in granting summary judgment on plaintiff's specific negligence counts.

Although we recognize that in Illinois it is well settled that a physician is held to the standard of care exercised by a good practitioner in the same or similar community (*Thompson v. Webb* (1985), 138 Ill. App. 3d 629), we note that in the instant case application of the locality rule is particularly inappropriate. The locality rule developed to protect the rural practitioner when facilities, educational opportunities, and an inability to travel created a variance between the care received in a rural community and the care received in an urban center. Because of the inequities inherent in the rule, many jurisdictions, including Illinois, adopted a same or similar locality rule. (*Thompson v. Webb* (1985), 138 Ill. App. 3d 629; *LeBrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322; *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072; *Hirn v. Edgewater Hospital* (1980), 86 Ill. App. 3d 939, 408 N.E.2d 970.) In recent years, the locality rule has not been extended beyond its rationale. (*Chamness v. Odum* (1979), 80 Ill. App. 3d 98, 399 N.E.2d 238.) With modern educational opportunities and means of travel, the focus of the protection afforded by the rule is on the facilities and testing mediums available to the local physicians. See, *inter alia, Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072; Illinois Pattern Jury Instruction, Civil, No. 105.01, Comment (2d ed. 1971).

In the instant case, defendants seek to use the locality rule as a method of defeating plaintiff's claim rather than as a method of shielding a practitioner who has less opportunity for education or limited facilities. First, the Clinic is a nationally recognized medical group practice. In order to achieve this recognition, it had to be nationally qualified, have facilities approved by a national review group, and have nationally qualified personnel. It is affiliated with a medical school and is an urban unit. Most of its physicians are board certified. The procedure relating to enema administration is not complex.

Secondly, the radiologist involved in post-discovery care was board certified and taught clinical students. Maintaining that a nationally recognized, urban, physicians' association with access to current medical technology should benefit from the protection the same or similar community standard affords the rural practitioner disregards the purpose and rationale behind the locality rule. (See generally *Thompson v. Webb* (1985), 138 Ill. App. 3d 629.) However, the same or similar community standard is the law in Illinois.

*RES IPSA LOQUITUR*
Plaintiff next argues that the trial court erred in dismissing his

*res ipsa loquitur* counts. We agree.

■ The *res ipsa loquitur* doctrine is a type of circumstantial evidence doctrine which allows the trier of fact to infer negligence if plaintiff shows: (1) an occurrence of a nature which ordinarily does not happen absent negligence; (2) the instrumentality was within defendant's control, defendant's actions proximately caused the injuries; and (3) the injury was not due to plaintiff's actions, lack of contributory negligence. *Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 216; *McMillen v. Carlinville Area Hospital* (1983), 114 Ill. App. 3d 732, 450 N.E.2d 5.

The first element necessary in *res ipsa loquitur* may be shown by expert testimony or in an appropriate situation may be within the common understanding of nonmedical persons. (*Walker v. Rumer* (1978), 72 Ill. 2d 495, 381 N.E.2d 689; *Edgar County Bank & Trust Co. v. Paris Hospital, Inc.* (1974), 57 Ill. 2d 298, 312 N.E.2d 259.) As noted earlier, plaintiff may rely upon defendants' experts' testimony and the enema administration protocol. These establish the standard of care. However, defendants' experts stated that perforation was highly unusual but could occur absent negligence.

■ In *Spidle*, a similar circumstance existed. There, expert testimony indicated that plaintiff's fecal vaginal fistula was a rare, unusual complication of a hysterectomy. The court held that proof of an unusual event coupled with evidence of specific negligence is sufficient to submit a *res ipsa loquitur* claim to a jury. The legislature modified section 2—1113 of the Code of Civil Procedure in response to *Spidle*. (See debate on House Bill 1029, May 17, 1981.) Under section 2—1113, as modified, proof of an unusual event may be coupled with proof of a specific negligent act and the doctrine will apply. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1113; see also *Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 434 N.E.2d 50.) Here, a dispute of fact exists as to whether Strode inserted the enema catheter tip with excessive force. The disputed evidence, shows specific acts of negligence coupled with an unusual event. *Spidle v. Steward* (1980), 79 Ill. 2d 1, 402 N.E.2d 216; *Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 434 N.E.2d 50.

The trial court noted that it was granting summary judgment on the *res ipsa loquitur* counts because testimony indicated that the perforation could have been caused by a preexisting rectal defect or disease. A review of the record shows that Thow and Cusack speculated that a rectal disease or defect may have been present. A pathology report of the sigmoid colon, revealed chronic focal inflammation. Thow and Cusack speculated that the inflammation was continuous.

938

Both, however, admitted that there was no evidence of any rectal abnormality. Bonello stated that the inflammation could have been caused by the post-perforation infection. The record does not present any evidence of a rectal disease or defect.

For the above reasons, we reverse the trial court and remand for further proceedings.

Reversed and remanded.

WEBBER and MORTHLAND, JJ., concur.