MARY K. SADNICK, Plaintiff-Appellant, v. BERNARD DOYLE, Defendant-Appellee.

Third District   No. 3—86—0111

Opinion filed July 7, 1987.

BARRY, J., specially concurring.

Laird M. Ozmon, of Laird M. Ozmon, Ltd., of Joliet, for appellant.

Robert B. Gorbold, of Thomas, Wallace, Feehan, Baron & Kaplan, Ltd., of Joliet, for appellee.

JUSTICE WOMBACHER delivered the opinion of the court:

The plaintiff, Mary K. Sadnick, brought the instant medical malpractice action to recover damages occasioned by the alleged negligence of the defendant, Bernard Doyle, M.D., in removing her tattoo, in failing to warn her of complications, in severing her great auricular nerve, and in causing excessive scarring. After barring the plaintiff's expert testimony about the pertinent standard of care, the trial court entered a directed verdict in favor of the defendant. The plaintiff appeals. We reverse and remand for a new trial.

In August of 1983, the plaintiff consulted Dr. Doyle to remove a nickel-sized, aged tattoo from the left side of her neck. During the examination, Dr. Doyle informed Sadnick that the simple, outpatient procedure would produce a hairline scar that would blend into the crease of her neck. On August 25, Dr. Doyle excised the tattoo, stitched the incision and covered it with a towel instead of a dressing. The use of a towel was standard procedure, according to Dr. Doyle's testimony. He prescribed pain medication for Sadnick's swollen, stiff, bleeding neck and advised her to notify him if swelling, increased discomfort, pain or drainage occurred. Two days later, Dr. Doyle opined that the incision looked fine and advised her to resume work and normal activities.

The plaintiff subsequently noticed drainage and on approximately September 2, her neck throbbed and swelled. Sadnick cleansed the incision and later saw Dr. Doyle. Upon discovering that blood had collected in the infected, swollen, crusted area, he made two additional incisions to insert a drainage tube. During the next consultation two days later, Dr. Doyle anticipated that the incision would heal nicely and that her tingling ear and neck numbness would subside. He suggested that she call him if problems developed prior to her next scheduled appointment.

Instead of returning to Dr. Doyle, Sadnick consulted Dr. Halem Galal about the loss of feeling in her ear and neck and her expanding, swollen incision. Her employer terminated her employment because she would not perform her housekeeping duties. Eventually her neck stiffness subsided, but her neck tingled when touched. The swollen, discolored scar healed, but both caused her embarrassment and affected her manner of dress.

Dr. Galal, a board-certified plastic surgeon who practices primarily in Cook County, testified that on March 28, 1984, the plaintiff was bothered by both the scar and the numbness in her left ear. When Dr. Galal was questioned about the standard of care to excise a tattoo in La Salle County, the defendant objected based on the "similar locality" rule. (See *Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 458 N.E.2d 1072.) In sustaining the objection, the court ruled that familiarity with local rather than national standards was critical. Dr. Galal then testified that he was unfamiliar with the local standards of La Salle County general surgeons who excise tattoos, but that he was familiar with the minimal, nonspecialized, uniform Illinois standards for such procedures. According to Dr. Galal, familiarity with a given locality was irrelevant because certain minimal, uniform Illinois standards are applicable to tattoo excisions regardless of the locality. At this point defendant objected, once again raising the "similar locality" rule. Relying on *Bartimus*, the court prohibited Dr. Galal from testifying further because of his unfamiliarity with the local standards of La Salle County physicians.

The plaintiff proceeded with an offer of proof which established the following. Based on contacts with doctors from various locations, Dr. Galal opined that minimal surgical standards apply to tattoo excision regardless of locality. Dr. Galal also stated he was familiar with the standard of care to excise tattoos in similar localities. In addressing the defendant's renewed objection the court considered the doctor's education and work experience but still found insufficient grounds to allow his testimony.

Dr. Galal continued the offer of proof with testimony that he was unfamiliar with La Salle County hospitals, but had practiced in similarly located hospitals. After both treating La Salle County patients and consulting La Salle County doctors, he had determined that the La Salle County surgical standard of care was applicable not only to tattoo excision but also to surgery throughout Illinois. In Dr. Galal's opinion, offering alternatives to the patient is essential because no tattoo treatment is ideal. Informing the parties of probable results, limitations, and complications is nearly as important, and any doctor who excises tattoos, but warns of no complications, deviates from the requisite standard of care. Dr. Galal concluded by noting that the plaintiff's scar is near the embedded auricular nerve that supplies sensation to the ear, and that nerve should not have been severed during her neck tattoo excision. The court acknowledged that offer of proof but refused to allow Dr. Galal's testimony.

The defendant, a board-certified general surgeon, explained that

he only offered to excise the plaintiff's tattoo. He defined a tattoo as pigment located less than one-half millimeter under the skin. The procedure required a one-millimeter-deep incision about the nerves. In his opinion, a scar was inevitable but its unanticipated size was affected by fluid collection. To comply with his understanding of a surgeon's standard of care, he only informs the patient of anticipated complications. He had warned the plaintiff, whose only concern was eliminating the tattoo, of none other than the scarring. He only anticipated drainage and an uncomplicated hairline scar. Her operation was the defendant's first tattoo incision, but he had regularly removed cancerous skin sections similarly located. In defendant's opinion he did not cut too deeply.

The final witness was Dr. Vincente Ng Tsai, a board-certified plastic surgeon practicing in Joliet and Morris. He was the disclosed expert of the defense who had to be subpoenaed as an adverse witness to testify as the plaintiff's expert when the trial court refused to allow Dr. Galal to testify with regard to the standard of care. Based on familiarity with standards of care of reasonably well-qualified general surgeons removing tattoos in similar localities, Dr. Ng Tsai suggested that local expectations were higher and patients expected finer scars from plastic surgeons. In his opinion, complications from excision, the most common means of removing an aged tattoo, were neither foreseeable nor probable. He would expect a general surgeon in La Salle County to mention scarring, but not all possible surgical risks and complications such as nerve damage. He attributed the plaintiff's lower ear numbness to nerve injury due to surgical nicking or cutting, or impingement from scarring. He observed that her medically acceptable hypertrophic scar had achieved permanency.

After the plaintiff rested her case, the defendant moved for a directed verdict. The court allowed the defendant's motion based on findings that the parties had discussed the possibility of scarring and that the plaintiff's subjective nerve damage symptoms did not conclusively result from cutting or nicking the nerve.

■ Initially we note that a directed verdict is only appropriate if all the evidence, when viewed most favorably toward the nonmoving party, so overwhelmingly favors the movant that no contradictory verdict based on the evidence could stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) The plaintiff attacks the directed verdict by suggesting that the court inappropriately barred her expert's testimony.

■ To establish negligent medical malpractice, the plaintiff must prove the proper standard of care to measure the defendant

physician's conduct, a negligent breach of that standard, and a resulting injury proximately caused by the physician's lack of skill or care. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867.) The expert who establishes the physician's deviation from the pertinent standard of care must be both a licensed member of the school of medicine about which he opines and familiar with the ordinary methods, procedures and treatments of physicians in the actual or a similar community, unless certain uniform standards apply regardless of either locality or available conditions and facilities. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 243, 489 N.E.2d 867, 872.) In fact, a doctor familiar with nationally uniform, minimum standards of medical practice is considered knowledgeable of all localities, including the place of treatment. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 250, 489 N.E.2d 867, 876.

■■ Under the *Purtill* rule, we find that the instant physician's standard of care to excise the plaintiff's tattoo was akin to nationally recognized uniform minimum standards, rather than local minimal, nonspecialized, treatment standards based on conditions and facilities available to the treating physician. We further find that the court wrongly prohibited Dr. Galal's testimony about the relevant standard of care, deviations therefrom, and their relationship to the cause of the plaintiff's medical problems. Hence, the court substantially erred in allowing the defendant's motion for directed verdict.

Accordingly, the judgment of the circuit court of La Salle County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

STOUDER, J., concurs.

JUSTICE BARRY, specially concurring:
I agree with the majority holding that a new trial is necessary. However, my reading of the record suggests that my brethren have not presented the facts impartially. For example, the trial court found there was no objective evidence of the nerve damage sensation of which the plaintiff complained, whereas the majority appears to accept that there was permanent auricular nerve damage, perhaps even the severing of that nerve, as fact. In fact, the trial court stated that there was no medical evidence of what caused plaintiff's alleged nerve damage. And, my brethren describe the result immediately after the excision of the nickel-sized tattoo as a "swollen, stiff, bleeding neck," thereafter covered with a towel "instead of a dressing." I find nothing in the record to justify such a description of the conclusion of the

surgical procedure. Further, it is the testimony that this was not the defendant's first tattoo excision. Rather, it was his first tattoo excision from the side of a patient's neck.

Though certainly *Pedrick* is applicable and its standard demands that we view the evidence in the light most favorable to the plaintiff here, in my judgment we should recognize that the defense has yet to put on its evidence, and fairness suggests that only record facts be included in our decision, not conclusions from allegations.

Nonetheless, I join my colleagues and concur in the result for the reason that the trial court did inappropriately bar the testimony of the plaintiff's expert, Dr. Galal, and substantially erred in allowing the defendant's motion for directed verdict.