WALLS v. BOYETT, ADMX.

4-9079                                          226 S. W. 2d 552

Opinion delivered February 6, 1950.

542

*Reid & Roy,* for appellant.

*Denver L. Dudley,* for appellee.

MINOR W. MILLWEE, Justice. Mrs. Dorothy Bell Schultz was critically injured in an automobile accident in or near the City of Blytheville, Arkansas, about 2:00 a. m. January 5, 1946, and died nine days later. The car in which she was riding at the time with some other young people was being driven by her "date," Raymond Crawford. Mrs. Schultz was taken to Walls Hospital, which is owned and operated by appellant, Dr. J. M. Walls, in the City of Blytheville. She remained at the Walls Hospital until two days before her death, when she was removed to another hospital.

Appellee, Ethel Boyett, mother of Mrs. Schultz, qualified as administratrix of her daughter's estate and brought suit against Raymond Crawford, driver of the automobile, Ira Crawford, owner of the car, appellant, J. M. Walls, as owner of Walls Hospital, and Virgil Walls, business manager of said hospital. The complaint charged that the negligence of Raymond Crawford in the operation of the automobile, coupled with the negligent acts and lack of proper attention and treatment by appellant, Dr. J. M. Walls, resulted in the

death of Mrs. Schultz. Dr. Walls and Virgil Walls were also charged with false imprisonment by refusing to permit Mrs. Schultz to be removed to another hospital.

At the time of submission of the case to the jury all defendants and issues in the case had been eliminated by demurrer, or other pleadings, except the charge against appellant for alleged negligence in the treatment and attention given deceased while a patient in the hospital. The liability of appellant for damages was limited by the able trial judge to compensation to deceased's estate for conscious pain and mental suffering, if any, sustained by deceased as the result of the negligent conduct of the appellant. In this connection the jury was instructed that there was no testimony showing that appellant was in any way responsible for the death of Mrs. Schultz, and that the burden was upon appellee not only to show that appellant or the hospital attendants were negligent in the treatment and attention given, but also to prove that damages resulted from such negligence.

The jury returned a nine to three verdict in appellee's favor for $500. On this appeal from the judgment rendered on the verdict, appellant has abandoned all assignments of error except those which assert that the evidence was insufficient for submission of the case to the jury and that the trial court erred in refusing to direct a verdict for appellant. There is no cross-appeal.

Appellee alleged in her complaint that when her daughter was taken to appellant's hospital, she was placed in a corridor open to the public gaze where she remained until the eighth day without medical treatment except for occasional hypodermics.

Mrs. Schultz was admitted to Walls Hospital about an hour after the accident. The hospital was crowded and there was no regular room available. Mrs. Schultz was placed upon a metal folding cot in a room which had formerly been used as a doctors' dressing room and lounge. She was removed to a private room and placed

on a regular hospital bed when such room became available two days later.

According to the testimony of appellant, which appears to be undisputed, Mrs. Schultz was suffering from a fractured skull, a massive brain hemorrhage, broken back, partly severed spinal cord, fractured right arm and paralysis from her shoulders down. She had three lacerations across one side of her throat exposing the jugular veins with the small jugular severed and her tongue was cut almost in two. She also had one collapsed lung as a result of previous tubercular trouble. Appellant and the surgical nurse were summoned upon Mrs. Schultz's arrival at the hospital. Appellant, with the nurses' assistance, sutured the lacerations, reduced the fractured arm by application of a plaster splint, administered tetanus antitoxin and sedatives and removed broken glass from several parts of the patient's body. The next morning appellant noticed the development of pneumonia which was soon cleared up by penicillin shots.

Appellee and her sister remained with her daughter most of the time while she was in the hospital. In her testimony appellee made numerous charges of mistreatment and inattention. Many of these were in the nature of conclusions of a worried and distraught mother and were shown upon her own cross-examination to be without substantial basis in fact. She testified that her daughter was placed upon a cot without a mattress; that she was not properly washed and bathed; that appellant should have operated on her head; that there was no need for the plaster cast on her arm; that X-rays should have been made; that the patient had no bowel movement; that she was not fed; and that she was neglected generally by attendant nurses. On cross-examination, she stated that she was not making any criticism of appellant for putting a cast on deceased's arm; that the nurses would come in and give deceased shots and take her temperature; that she was given glucose and penicillin shots, which cured the pneumonia; and that they tried to give her epsom salts through her nose but she would not take it.

She further testified on cross-examination: "Q. You have told us though they hadn't done anything— A. He hadn't. Q. But you are charging him with— A. I ain't charging him with nothing. He'se over the nurses. He had them doing the things. He got mad because I got a room—that would be the truth. He couldn't take it. He just went right out and didn't say a word. Q. Yet they were there working with your daughter, trying to help her? A. After he had seen it. That's all I could say. Q. But you forgot to tell us they had done that? A. No, sir; I didn't forget. You just didn't ask me. You forgot to ask me that. I know everything they done. Q. Are you remembering the fact that penicillin was given repeatedly? A. They gave her about two shots of it. They said they done had it broke. Q. And if they gave more than two shots of penicillin you have forgotten it then? A. No. That's the onliest time they give her anything, unless she got to hollering so loud. Then they would come in and give her a hypo. Q. If the doctor were to tell you that repeated hypodermics, taken in your daughter's condition, would be dangerous to her recovery, would you believe that? A. They ought to know what they are doing, but they really gave her them. Q. I thought you were objecting because they didn't give them often enough. A. Didn't give what often enough? Q. Didn't give her hypodermics often enough. A. No, I didn't object because they didn't give them often enough. I didn't object to that. It looks like they could have given her something besides a shot. If they had just done something, tried to get her better, or take any interest in her. Mr. Reid, it was the interest part. They didn't take any more interest in her, no more than if she had been a hog. Q. You mean giving her hypos they didn't take any interest in her? A. I didn't think the nurse should give her a shot and then walk on out. I didn't reject nothing—anything they done. Not one thing. Q. And in giving her the glucose they were not taking an interest in her? A. If they had only tried to do something for her. I knew she needed it. I had to take so much myself. She was starving to death.

"Q. Tell me just exactly now what is your criticism? What did they do, or didn't do, to your daughter that you complain of? A. Mr. Reid, I can't even tell you how that was—how they were to me. There weren't nothing done for Dorothy—if they had just made an effort to pull her up from there. If there had been I wouldn't have been up here. Q. What did you want him to do? A. Do something for her. Come in there and treat her like she was a human—like I was treated when I was up there with an operation; come in and see if she was better or worse. Q. What was it they did that wasn't like they treated you? A. Because they didn't do anything for her. Mr. Dudley: What is it? A. What I didn't like about it, he said. Because they didn't give her— Mr. Reid: Q. Didn't give her what, Mrs. Boyett? A. They just didn't give her attention. They didn't show her no respect, as if she was a human, Mr. Reid. You know that is just pitiful, to let anybody like Dorothy just lay there and be treated that way . . .

"Q. Tell me, please, where he failed to show respect? A. In not coming in and seeing her hisself, or letting the nurses come in and telling me, like a mother should be told: 'Mrs. Boyett, Dorothy is better, and we have hope for her.' I could have stood it. I just watched and wished for something. Q. Let's pin it down then: You wanted them to come in and sympathize with you? Is that it? A. No—no: I did not. I've been in other hospitals. I've been in other hospitals—you could get the record of it I just wanted them— Q. Well now, what is it you say they didn't do? They didn't tell you she was going to get well, or was not going to get well, or didn't show you sympathy? Is that the trouble? A. No—no. I knowed she couldn't live unless something was done for her. Her head should have been operated on and this place raised up. He didn't do that."

Dr. Walls and the nurses testified that Mrs. Shultz was unconscious at all times while she was in the hospital. On cross-examination appellee testified: "Q. Mrs. Boyette, from the time your daughter entered the hospital until the time she left she was in an unconscious condition, wasn't she? A. Absolutely; yes, sir." On

re-direct examination she stated: "Q. Now, I don't know whether you caught the question or not, but Mr. Reid asked you if she was unconscious at all times,— A. Oh, yes. Q. After she was brought to the hospital? A. Yes. Mr. Dudley, Lord, I would have give the world if she had spoke just one word to me. Q. You said this morning she recognized you— A. I would say 'Dorothy, honey, do you know who this is?' She would say 'Mama.' That's all in the world she said. If she tried to talk her eyes just glittered like that. But she couldn't talk. She was out."

It is well settled under our decisions that a physician or surgeon in the treatment of patients is required to possess and to exercise that degree of skill and learning ordinarily possessed and exercised by members of his profession in good standing, practicing in the same line, and in the same general neighborhood, or in similar localities; and he must use reasonable care in the exercise of his skill and learning and act according to his best judgment in the treatment of his patients. *Dunman v. Raney*, 118 Ark. 337, 176 S. W. 339; 41 Am. Jur., Physicians and Surgeons, § 82.

In *Gray v. McDermott*, 188 Ark. 1, 64 S. W. 2d 94, Chief Justice JOHNSON, speaking for the court, said: "The uncontradicted testimony in this case shows that the deceased received from his attending physicians, including Dr. Gray, the degree of skill and learning ordinarily possessed and exercised by members of their profession in good standing in this neighborhood, and that they used reasonable care in the exercise of their skill while attending him after he was shot, and that they exercised their best judgment in administering their services. This is all that is required of physicians and surgeons in this State. It may be that some outstanding surgeon could have or would have done something for Mr. McDermott that was not done by these physicians, but this is purely speculative in so far as this record is concerned. Moreover, this is not the test to be applied in cases of this kind. Reasonable care, skill and learning is all that is required."

It is equally well settled that the keeper of a hospital is liable for damages if he fails to perform some duty which he owes to the patient and the patient is injured as a result of this failure; and the extent and character of this duty depend on the circumstances of each particular case. *Durfee* v. *Dorr,* 123 Ark. 542, 186 S. W. 62.

Such questions as whether the plaster cast should have been placed on the fractured arm, X-ray made, or an operation performed were obviously issues requiring scientific knowledge to determine. *Gray* v. *McDermott, supra.* The uncontradicted medical testimony of appellant, Dr. Husband and Dr. Hubener was that approved and proper treatment was given; that the nature and extent of the injuries were ascertainable and known without the use of X-ray and that the patient's restless condition rendered it dangerous and difficult to obtain proper pictures; that surgery was not only inadvisable but would have in all probability hastened death; and that rest and quiet offered the best hope of recovery. Dr. Hubener treated the patient after removal to the second hospital. While he stated that he took X-ray pictures, he also testified that this was done to please appellee rather than from any clinical benefits to be derived therefrom; that the patient had an acute brain injury and little chance of survival from the beginning.

If it be said that the jury was warranted in finding negligence on the part of appellant, or his attendants, on the disputed questions of whether there was a mattress upon the cot first used, the bed linens were properly changed, the patient properly bathed and similar charges of inattention, the question remains as to whether there was substantial evidence to show that Mrs. Schultz endured conscious pain or mental suffering by reason of said negligence. If there was such conscious pain and suffering, in addition to the suffering which the patient's existing critically injured condition would have caused her, and there is sufficient evidence to show that the increased pain was caused by the negligence of appellant, the verdict should stand. *Durfee* v. *Dorr,* 131 Ark. 369, 199 S. W. 376. After con-

sideration of the evidence in the light most favorable to appellee, we conclude that the evidence is insufficient to show that Mrs. Shultz suffered additional conscious pain or mental suffering on account of the acts or omissions charged. As we view the evidence, it is virtually undisputed that deceased was never conscious while she was in the hospital. We find no substantial evidence affording a basis for a reasonable inference by the jury that additional conscious pain or suffering proximately resulted to deceased on account of the negligence of appellant or the hospital attendants. It follows that the verdict rests on speculation and conjecture.

The judgment is, therefore, reversed. Since the cause of action seems to have been fully developed, it is dismissed.