**Mary Irene PEGRAM, Plaintiff,**

v.

**Dr. Friedman SISCO, Defendant.**

**No. F–72–C–46.**

United States District Court,
W. D. Arkansas,
Fayetteville Division.

Jan. 13, 1976.

Garner, Garner & Cloar, Fort Smith, Ark., for plaintiff.

Shaw & Ledbetter, Fort Smith, Ark., for defendant.

## MEMORANDUM OPINION

PAUL X. WILLIAMS, Chief Judge.

This is a medical malpractice case which was tried before the Court without a jury on November 24, 1975. In lieu of a closing argument, each party has submitted a written brief. On the basis of the briefs, the evidence presented at trial and the applicable law, the Court finds that the plaintiff, Mary Irene Pegram, is entitled to judgment against the defendant for $13,700.00 and the costs of this action.

In 1970 plaintiff was thirty-five years old and the mother of eight children. She was residing in Springdale, Arkansas, and working at the Bear Brand Hosiery Factory in Fayetteville. She began to feel tired and to experience heavy bleeding between her menstrual periods and went to see Dr. C. S. Applegate, a physician practicing in Springdale, Arkansas. Dr. Applegate performed a Pap smear on the plaintiff.

On August 27, 1970, the plaintiff underwent conization of the cervix which revealed that plaintiff was suffering from early evasive squamous cell carcinoma of the cervix.

When the plaintiff was released from the hospital after the conization, Mrs. Pegram consulted with Dr. Applegate who advised her that she should undergo a radium implant and recommended that the defendant, Dr. Friedman Sisco, be the physician to do the procedure. With Mrs. Pegram in his office, Dr. Applegate telephoned the defendant, Dr. Sisco, and the hospital and set up the appointment for the radium implant. During this period of time, the plaintiff neither saw Dr. Sisco nor talked with him over the telephone.

On September 14, 1970, the plaintiff was again admitted to the Springdale Memorial Hospital. At the trial she testified that on the first night of this hospital visit she was prepared for the operation by nurses, but that neither Dr. Sisco nor Dr. Applegate visited her. She testified that on the day of the implant, September 15th, she was given a shot and remembered being taken to an elevator, and the next thing she remembered was waking up after the implant had occurred.

Mrs. Pegram remained in the hospital for four days. She testified that during her stay, she only saw Dr. Sisco a few times: on the evening after the radium had been implanted in her uterus, the day he removed the radium implant, and the day that she was discharged from the hospital. She testified that the first time she realized that she had had radium implanted in her uterus was on the 18th, when the nurse came to take her to the operating room saying that Dr. Sisco would now remove the implanted radium.

After being released from the hospital Mrs. Pegram experienced a burning sensation, fatigue and diarrhea. When she contacted Dr. Sisco she was told that the symptoms she described were to be expected after the radium procedure which she had undergone. Mrs. Pegram was examined and treated by Dr. Sisco in his office approximately every other week from the time of the radium implant through the middle of January, 1971, a period of four months. During this time Dr. Sisco's treatment consisted primarily of renewing a prescription to relieve Mrs. Pegram's pain and discomfort.

In the last part of January, 1971, plaintiff went to Texas, and while there she began to uncontrollably pass fecal material through her vagina. She went to see a doctor in Texas and returned to northwest Arkansas where she consulted Dr. Nancy Rabon in February, 1971. Dr. Rabon diagnosed Mrs. Pegram as having a large fistula, an unnatural opening between her uterus and her colon, and made arrangements for the plaintiff to obtain treatment at the University of Arkansas Medical Center in Little Rock.

In Little Rock, Mrs. Pegram underwent a radical hysterectomy, bowel resection and sigmoid colon operation on March 23, 1971. The surgery, performed by Dr. Ramon Lopez on March 23, 1971, was very arduous, and she remained in the hospital for almost four weeks afterwards. She testified that she had become progressively weaker after the radium implant, and she weighed only ninety-eight pounds when she was discharged from the Arkansas Medical Center. She testified that she had incurred medical expenses of $3,688.05; that she was incapable of eating solid food for four or five weeks after the operation; that she could not cook for her family for three and a half months; and it was only after nine or ten months following the Little Rock operation that she could function as she had prior to the radium implant.

### INFORMED CONSENT

One of Plaintiff's theories of malpractice is the failure of Dr. Sisco to obtain her "informed consent" to the radiation therapy. There appear to be no Arkansas cases which have specifically dealt with this issue, but the doctrine is commented upon in *Arkansas Model Jury Instructions*, Ch. 15 (1974). As pointed out in *Canterbury v. Spence*, 150 U.S.App.D.C. 263, 464 F.2d 722 (1972), a physician's failure to obtain an informed consent may give rise to a suit for an intentional assault and battery, though

such suits are usually brought alleging negligence. In a negligence action the physician is held liable when he inexcusably fails to disclose risks and dangers of the proposed treatment which other members of his profession or specialty would disclose to the patient.

In this case, Mrs. Pegram testified that neither Dr. Applegate nor Dr. Sisco ever explained to her the basic nature of the procedures, that radium capsules would be inserted into her uterus, allowed to remain there for several days and then removed. She testified no one explained to her that a hysterectomy was an alternative to the radium implant procedure and that there was no mention of any of the unpleasant aftereffects or possible complications. At the trial both Dr. Rabon and Dr. Ramon Lopez testified that it was standard medical practice in Fayetteville and Little Rock to inform a potential implant patient of alternative procedures of the unpleasant aftereffects, and of the possibility of radium burns and fistulae.

■ Dr. Sisco proffered two defenses to this charge. First, he alleged that he was only called in as a "consultant"; that Dr. Applegate was Mrs. Pegram's treating physician until after the operation; and that it was Dr. Applegate's responsibility to obtain an "informed consent" for the procedure. He also testified that when he was first contacted about treating the plaintiff, he assumed that Dr. Applegate had fully discussed the procedure with the plaintiff. Neither plaintiff nor defendant has cited any cases which establish whether the duty to obtain an informed consent lies with the referring physician or with the surgeon who actually performs the operation. From the testimony at trial it appears that the parties contemplated that Mary Irene Pegram would be placed under the care of Dr. Sisco when she entered the hospital and that he would assume primary responsibility for the radium implant. From the nature of the relationship and from the testimony of Dr. Ramon Lopez, we find that Dr. Sisco did not adhere to the medical community

standards when he "assumed" consent had been obtained by the referring physician and failed to obtain the informed consent for himself. It is a standard rule of medical malpractice law that a surgeon cannot escape liability for the acts of hospital employees who assist in the operating room. See, *Spears and Purifoy v. McKinnon*, 168 Ark. 357, 270 S.W. 524. This theory may be so broad as to include other physicians. We find this principle to be applicable to the situation before the Court only to the extent that it shows the very special relationship between surgeon and patient and the very high degree of responsibility placed on the surgeon.

■ Dr. Ramon Lopez testified that it was standard medical procedure for the surgeon to obtain an informed consent before conducting a radium implant. Given the responsibility placed on surgeons and the relationships existing between the plaintiff, Dr. Sisco and Dr. Applegate, we find that the defendant breached the community medical standard in failing to discuss the radium implant procedure before conducting the operation. The hospital records do not reflect such a visit, but they do reflect that Mrs. Pegram received sedation early on that morning. Mrs. Pegram testified that she did not remember any meeting with Dr. Sisco before the operation. In light of these facts, we find that there was no informed consent obtained.

■ Dr. Sisco also argues that plaintiff executed a standard consent form, and that she cannot now be heard to say she never consented. Unless a person who consents to an operation knows its dangers, the consent is ineffectual. A patient must be reasonably informed of all material elements of the procedure and all material risks which may affect his decision to undergo the treatment. In this regard, it is generally said that when a procedure involves a known risk of serious bodily harm, a medical doctor must exercise due care to disclose to his patient the potential of serious harm, the complications which might occur and al-

ternatives to the contemplated treatment. See, *Canterbury v. Spence*, supra.

The extent of the disclosure depends upon the weighing of various factors by the physician. He must give his patient sufficient information so that the consent is an informed one, and yet he may withhold information if its disclosure would be harmful or detrimental to the patient's best interest. In deciding what should be disclosed, the physician must possess and, using his best judgment, apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of his profession in good standing, engaged in the same type of practice in the locality in which he practices, or in a similar locality. *Walls v. Boyett*, 216 Ark. 541, 226 S.W.2d 552 (1950).

■ There is nothing in the standard consent form signed by the plaintiff which shows that the plaintiff in fact received sufficient information to render her consent viable.

## NEGLIGENT TREATMENT

■ In medical malpractice cases the physician must possess the degree of skill and learning ordinarily possessed and used by members of his profession in good standing, engaged in the same type of practice in the locality in which he practices or in a similar locality. *Graham v. Sisco*, 248 Ark. 6, 449 S.W.2d 949 (1970).

This Court is not unaware of the caveat recently announced by the Arkansas Supreme Court in *Gambill v. Stroud*, 258 Ark. 766, 529 S.W.2d 330 (1975), in which Justice Smith says:

"One holding himself out as a specialist should be held to the standard of care and skill of the average member of the profession practicing the specialty, taking into account the advances in the profession. And, as in the case of the general practitioner, it is permissible to consider the medical resources available to him."

Neither are we unaware of the strong dissent authored by Justice Fogleman. Under the guidelines of *Parish v. Pitts*, 244 Ark. 1239, 429 S.W.2d 45 (1968), we consider the law to be that the "community standards" test is applicable to the facts now before this Court.

■ As laymen are not generally aware of the state of learning in the medical profession, expert testimony is usually required to establish that the physician either lacked the required skill and learning or that he failed to apply it with due care in the particular circumstances. *Gray v. McDermott*, 188 Ark. 1, 64 S.W.2d 94 (1933).

■ Applying these principles to the case at bar, it is apparent that even though Dr. Sisco probably saved the plaintiff's life, he was negligent in failing to take X-rays while the radium was implanted and in failing to provide the plaintiff with adequate post-operative care.

The Court notes that it is extremely rare for physicians and surgeons to willingly testify against another member of their profession, who, in fact, saved the patient's life. Here, both Drs. Ramon Lopez and Nancy Rabon testified that Dr. Sisco should have made X-rays to determine how much radium the colon was receiving. They testified that a surgeon who realizes that the colon is receiving an excessive amount of radium because of the shape and position of the patient's uterus would be more alert to the increased possibility that a fistula would develop and then could take immediate action to repair it.

Dr. Sisco testified that he did not need to take an X-ray because in the procedure which he followed it did not matter if the uterus was retroflexed or not.

At trial, it developed that there were two reasons surgeons require X-rays before radium is implanted in the uterus. The first reason is to determine the shape and location of the uterus so that the surgeon can insert the radium in the proper direction to prevent rupture of

the uterus. Dr. Sisco's technique was to place radium capsules into a flexible rubber tube, which would be inserted. As the tube would conform to the shape of the patient's uterine canal, there was no possibility of rupture. On this point Dr. Lopez and Dr. Ramon were in full accord with Dr. Sisco. However, the second reason that surgeons take X-rays is to ascertain how much radium the surrounding organs are receiving. If an adjoining organ is receiving an excessively large dose, then the surgeon is alerted to the greater possibility of fistulae and/or other post-operative complications. As the signs of a fistula first develop, the surgeon can make sure the patient gets immediate treatment.

There is no way to completely guard against the formation of fistulae, and Dr. Sisco cannot be held responsible for it. However, the evidence preponderates that the harm for which plaintiff is now being compensated resulted from not receiving the prompt attention for her fistula which she would have received.

In this regard, Dr. Sisco testified that usually a uterine radium implant was followed by a hysterectomy, and that it was his understanding Mrs. Pegram was to have a hysterectomy after the implant. Though Mrs. Pegram was seen by Dr. Sisco almost every other weekend, Dr. Sisco did not take any steps to see that the plaintiff underwent the hysterectomy.

Since the defendant did not take postoperative X-rays or any other steps to guard against the development or progress of the fistula and that certain needed post-operative examinations were not made, and that defendant's failure in this regard breached the community medical standards for care, the plaintiff is entitled to recover $13,700.00 in compensatory damages from the defendant.