938 F.2d 855
 Dennis PEARCE, as Parent and Next Friend of Alexander Justin
Pearce, a Minor; Linda Pearce, as Parent and Next
Friend of Alexander Justin Pearce, a
Minor, Appellants,
v.
CORNERSTONE CLINIC FOR WOMEN and Douglas B. Smith, M.D., Appellees.
 No. 90-1885.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 7, 1991.
Decided July 9, 1991.
 
 William R. Wilson, Jr., Little Rock, Ark., argued, for appellant; Donald V. Ferrell and Walden E. Morris, Harrisburg, Ill., and William R. Wilson, Jr. and Gary D. Corum, Little Rock, Ark., on the brief.
 C. Tab Turner, argued, for appellee; William H. Sutton and C. Tab Turner, Little Rock, Ark., on the brief.
 Before JOHN R. GIBSON and BOWMAN, Circuit Judges, and SACHS,* District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Dennis and Linda Pearce, parents and next friends of Alexander Justin Pearce, appeal from an adverse judgment entered on a jury verdict in their medical malpractice claim against Dr. Douglas B. Smith and the Cornerstone Clinic for Women. The Pearces claim that Dr. Smith failed to use an electronic fetal heart monitor when he administered the drug Pitocin to Linda Pearce during the delivery of her son, Alexander. The Pearces claim that this monitor would have detected that Alexander suffered asphyxia during delivery. On appeal, the Pearces argue that the district court erred by: (1) improperly instructing the jury on the standard of care required under Arkansas law; (2) allowing defense counsel to argue during summation about evidence that the district court had excluded and about other evidence that was never admitted; and (3) limiting the jury's consideration of the hospital's labor and delivery policy. We reverse.
 
 
 2
 During her pregnancy, Linda Pearce was a patient of the Cornerstone Clinic for Women, which employed Dr. Smith as an obstetrician. Dr. Smith attended Linda Pearce during her pregnancy, as well as her labor and delivery.
 
 
 3
 On January 21, 1981, Baptist Medical Center admitted Linda Pearce for "delivery in a completely normal case." Dr. Smith prescribed Pitocin to Linda Pearce during her labor and delivery. Dr. Smith did not use an electronic fetal heart monitor. Alexander was born limp and not breathing. Doctors resuscitated Alexander, placed him on a ventilator, and transferred him to the intensive care nursery. Doctors originally diagnosed Alexander as suffering from "hypoxic encephalopathy brain injury at birth." Later, several doctors diagnosed him as suffering from cerebral palsy. Alexander is a spastic quadriplegic who, among other problems, cannot walk or talk.
 
 
 4
 The Pearces filed suit against Dr. Smith and the Cornerstone Clinic claiming that Dr. Smith negligently failed to use an electronic fetal heart monitor during Alexander's delivery. A thirteen day trial followed. At trial, two primary issues developed--whether Dr. Smith acted within the required standard of care in failing to use an electronic fetal heart monitor, and whether Alexander's condition was caused by asphyxia that occurred during his delivery or an encephalomyopathy, a congenital primary muscle disease. Both sides presented several expert witnesses to support their positions.
 
 
 5
 The court submitted the case to the jury under Arkansas form instructions, and the jury returned a verdict for Dr. Smith and the Cornerstone Clinic. We further develop the facts necessary to the Pearces' arguments on appeal as we address their arguments below.
 
 I.
 
 6
 The Pearces argue that the court erred in instructing the jury by erroneously defining the standard of care required of doctors under Arkansas law. The court, using the Arkansas form instructions, instructed the jury as follows:
 
 
 7
 In diagnosing the condition of, and treating the patient, an obstetrician must possess and, using his best judgment, apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of his profession in good standing, engaged in the same specialty in the locality in which he practices or in a similar locality. A failure to meet this standard is negligence.
 
 
 8
 Ark. Model Jury Instructions (Civil ), 1501 at p. 169 (3d ed. 1989). (Emphasis added).
 
 
 9
 The Pearces argue that the phrase "using his best judgment," is contrary to the Arkansas statute defining the standard of care required. The Arkansas statute provides:
 
 
 10
 (a) In any action for medical injury, the plaintiff shall have the burden of proving:
 
 
 11
 (1) The degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he practices or in a similar locality....
 
 
 12
 Ark.Stat.Ann. Sec. 16-114-206 (1987).
 
 
 13
 In denying the Pearces' motion for a new trial based on the instruction, the district court reasoned:Arkansas Model Jury Instructions were promulgated by the Arkansas Supreme Court Committee on Model Jury Instructions. Plaintiffs' argument is based on the premise that the Arkansas Supreme Court does not know Arkansas law. However, this Court must indulge in the presumption that our Supreme Court knows the law in Arkansas.
 
 
 14
 Pearce v. Smith, No. LR-C-88-256, slip op. at 5 (E.D.Ark. Apr. 26, 1990).
 
 
 15
 The Pearces contend that by including the phrase "using his best judgment," the court injected a subjective element in the definition of the standard of care required of Dr. Smith. They further argue that even though the phrase is contained in the Arkansas form instruction, the instruction is contrary to current law, and that the Supreme Court order adopting the form instructions states that the form instructions shall be given "unless the trial judge finds that [they do] not accurately state the law." Order of Arkansas Supreme Court (Apr. 19, 1965) (per curiam). For these reasons, the Pearces contend that the court should have given an instruction deleting the phrase "using his best judgment."
 
 
 16
 We must first recognize that in this diversity case we apply the law of Arkansas and that when the Arkansas courts have not decided an issue, the district court and this court must attempt to predict the manner in which Arkansas courts would decide the question. The Supreme Court has recently made clear that this court must review questions of state law de novo. See Salve Regina College v. Russell, --- U.S. ----, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).
 
 
 17
 The doctor and clinic argue that the phrase in question is consistent with the statutory language, accurately states existing Arkansas law, and is only "three words in one of numerous lengthy jury instructions." They state that the Arkansas courts approved the "using his best judgment" language in Dunman v. Raney, 118 Ark. 337, 176 S.W. 339, 342 (1915), Walls v. Boyett, 216 Ark. 541, 226 S.W.2d 552, 556 (1950), and Gramling v. Jennings, 274 Ark. 346, 625 S.W.2d 463 (1981). Dunman and Walls, however, were decided before the Arkansas legislature amended section 16-114-206 in 1979, and the instruction was not in issue in Gramling.
 
 
 18
 Arkansas courts have not yet decided whether Arkansas law now requires or authorizes the "using his best judgment" language. The Arkansas Supreme Court was asked to construe section 16-114-206 in Alexander v. Chapman, 299 Ark. 126, 771 S.W.2d 744, 745 (1989), but declined to do so. The committee notes from the Arkansas Model Instructions explain that the instructions continue to include the phrase "using his best judgment" even though it is not included in the statutory definition of the standard of care, pending resolution of the issue by the Supreme Court. Ark. Model Jury Instructions (Civil), 1501 at 169 (3d ed. 1989).
 
 
 19
 The statutory definition creates an objective standard. Adding the language "using his best judgment" inserts subjective considerations into the objective standard. We are convinced that the Arkansas courts would not include such a subjective standard, and therefore, the court improperly instructed the jury on Arkansas law. See, e.g., Bennett v. Allstate Ins. Co., 889 F.2d 776, 779 (8th Cir.1989) (instruction requiring subjective knowledge incorrect when Arkansas authority required objective knowledge). For this reason, we reverse and remand the case for a new trial.
 
 II.
 
 20
 The Pearces also claim that the district court abused its discretion by failing to order a new trial based on statements defense counsel made during closing argument. The Pearces identify two lines of argument made by defense counsel during his summation that they contend resulted in reversible error.
 
 
 21
 First, defense counsel argued during summation that the parents had refused to allow Alexander to undergo "provocative and biochemical testing" that could determine whether his condition was similar to one affecting his uncle. After the Pearces objected, the court instructed the jury that "any arguments, statements or remarks of attorneys having no basis in the evidence should be disregarded by you." The Pearces contend that the defense counsel's statement referred to testimony that the district court had excluded during trial. Specifically, defense counsel asked one of the defendants' expert witnesses, Dr. Brooke, if he could have performed any further testing to identify the cause of Alexander's problem. Pearces' counsel objected to this question on relevancy grounds, arguing that the defense had never requested that Alexander undergo any additional testing. The court sustained the objection.
 
 
 22
 The defense argues that his statement in closing argument referring to "provocative and biochemical testing" did not refer to this excluded testimony, but instead, referred to the Pearces' refusal to allow Alexander to undergo a muscle biopsy, and that this evidence was fully supported by the record at trial.
 
 
 23
 We have carefully reviewed the transcript of the defense counsel's closing argument and record developed at trial. We are not persuaded that defense counsel's statements made in his closing argument concerned the muscle biopsy. Furthermore, the record relating to the muscle biopsy does not support defense counsel's statement that the Pearces had refused to allow Alexander to undergo testing. Testimony established that Dr. Brooke examined Alexander in 1986 and requested permission to perform a muscle biopsy. There was also undisputed testimony that Linda Pearce did not allow Alexander to undergo a muscle biopsy at that time. Nevertheless, undisputed testimony also established that the Pearces did allow Alexander to undergo a muscle biopsy in 1989, and the results of that muscle biopsy were hotly contested by both sides at trial. Thus, testimony concerning the muscle biopsy does not support the defense counsel's statement that the Pearces refused to permit testing of Alexander, and it was clearly improper for the defense to so state.
 
 
 24
 The Pearces also argue that the defense counsel committed reversible error by referring to the deposition testimony of local doctors whose depositions were not introduced at trial and who did not testify at trial. In defense counsel's opening statement, he told the jury that he would bring in local doctors who treated Alexander shortly after birth and who would modify their initial opinions that Alexander was injured during the birth process. The "local doctors" defense counsel referred to were Drs. Nestrud, Boellner, and Warford. Although none of these doctors testified at trial, their opinions were introduced by way of Baptist Medical Center's medical records, which contained statements from Drs. Nestrud and Boellner that Alexander suffered from "intrauterine asphyxia."
 
 
 25
 During closing argument, the Pearces' counsel pointed out to the jury that the defense had failed to honor its promise to bring in Drs. Nestrud, Boellner, and Warford and went on to discuss the records admitted in evidence.
 
 
 26
 In response, defense counsel stated during his closing argument:
 
 
 27
 From the standpoint of Alexander's brain problem, there is just no proof in this case, whatsoever, that asphyxia had anything to do with it. You might ask, "Tab, if that's so, how do you explain Dr. Boellner and Dr. Nestrud and what they put in their records in 1981?". I can explain it to you the way they explained it to Mr. Corum and his group when they visited and took depositions from these people.
 
 
 28
 MR. WILSON: If it pleases the Court, he's going outside the record, and I seriously object to it.
 
 
 29
 THE COURT: Keep your remarks inside the record.
 
 
 30
 MR. TURNER: Yes, sir, I will. In 1981, ladies and gentlemen, everybody thought, neonatology and pediatric neurology, that asphyxia was the major cause of cerebral palsy. They taught medical students that. Since that time the collaborative study in 1985 Dr. Volpe states, and Dr. Menke's text have come out. If these gentlemen, if you really thought that Dr. Boellner and Dr. Nestrud supported their position and the note that was written in that chart in 1981, don't you think these gentlemen would have had them up here testifying for you? They would have had them in here saying, "Yeah, I wrote that", and "Yeah, current medical science tells us that I was right. Current medical science tells us that they were wrong." And that's what they told them.
 
 
 31
 The Pearces argue that the district court allowed defense counsel to argue excluded evidence and evidence that was never offered at trial, and that the court's admonishments could not cure the prejudicial impact of these statements.
 
 
 32
 We have often stated that closing arguments are made under the direct control of the trial court. Vanskike v. Union Pac. Ry. Co., 725 F.2d 1146, 1149 (8th Cir.1984). We will not disturb the court's ruling unless an abuse of discretion occurred. Harris v. Steelweld Equip. Co., 869 F.2d 396, 405 (8th Cir.) (citing Vanskike, 725 F.2d at 1149), cert. denied, --- U.S. ----, 110 S.Ct. 70, 107 L.Ed.2d 37 (1989). To constitute reversible error, statements made in closing argument must be plainly unwarranted and clearly injurious. Id.
 
 
 33
 We believe these arguments are close to that line. Defense counsel's statement that the Pearces had refused to allow testing to determine the cause of Alexander's condition is not supported by the trial record. In addition, the statements concerning the explanations offered by the local doctors at their depositions were not part of the record before the jury and were clearly improper. Nevertheless, because we reverse the judgment on other grounds, we need not decide whether these arguments were "clearly injurious." We simply presume that in light of this discussion, the issue will not recur on retrial.
 
 III.
 
 34
 Finally, the Pearces argue that the district court committed reversible error by providing the jury with a limiting instruction when the Pearces introduced Baptist Medical Center's written regulations concerning labor patients.
 
 
 35
 Baptist Medical Center had written regulations entitled "Labor (Care of Patient)." The regulations provided that "If ... patient is receiving pitocin, ... place the patient on an external heart monitor." After considerable discussion out of the jury's presence, the district court allowed the Pearces to introduce this regulation in evidence, but instructed the jury that this regulation applied only to nurses, and that it could be considered "for the sole purpose ... of whether ... there is a national standard [of care]." The court further instructed that the regulation was not an "intimation at all that those nursing policies apply to doctors. In fact, the testimony from the hospital is to the contrary."
 
 
 36
 The Pearces argue that this instruction unduly limited the jury's consideration of this exhibit. The Pearces had introduced expert testimony that a national standard of care existed requiring fetal monitoring when a patient receives Pitocin. In addition, they had introduced the package insert from Pitocin, as well as information from the Physician's Desk Reference, both of which instructed that a physician should use an electronic fetal heart monitor when a patient receives Pitocin. The Pearces argue that the court's unexpected sua sponte limiting instruction effectively precluded them from using the Baptist Medical Center regulation for the very purpose for which it had been introduced, and that the policy was relevant and probative as to whether Dr. Smith violated the required standard of care.[1]
 
 
 37
 The defense, on the other hand, argues now as it did at trial, that the regulation applied only to nurses, and thus, was not relevant as to standard of care required of Dr. Smith. The defense points out that the Pearces could not establish that the nursing policy applied to doctors, and the only testimony presented on this issue was that the policy did not apply to doctors.
 
 
 38
 The issue before us is the propriety of the court's limiting instruction, not the admissibility of the evidence. Thus, the question is whether the district court abused its discretion in giving an instruction limiting the jury's consideration of the written regulation.
 
 
 39
 We believe that the district court may have unduly limited the jury's consideration of this evidence. We are persuaded that the regulation was probative as to the standard of care required because it related to medical care to be delivered to the patient even if the specific regulation applied only to nurses. See, e.g., Anderson v. Malloy, 700 F.2d 1208, 1212 (8th Cir.1983) ("custom or practice, if sufficiently similar to the situation in issue, generally has evidentiary value"). That the regulation applies only to nurses, of course, goes to the weight of the evidence, and the defense is free to bring this out in its cross and direct examinations. The Pearces cite no case law suggesting that a limiting instruction such as the one given here rises to the level of reversible error, and we need not decide the issue because we reverse on other grounds.
 
 
 40
 We reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Howard F. Sachs, Chief Judge, United States District Court for the Western District of Missouri, sitting by designation
 
 
 [1]
 The Pearces also argue that Dr. Smith testified that the policy applied in situations like the one in issue in this case in which a doctor as well as a nurse is present when administering Pitocin. Our review of Dr. Smith's testimony convinces us that the Pearces' interpretation of Dr. Smith's testimony is not a fair reading of that testimony