Margarette Pannell DOOLEY, as Administratrix of the Estate of John Floyd Pannell, Deceased, Plaintiff

v.

CAP–CARE OF ARKANSAS, INC., d/b/a Crestpark Retirement Inns—Crestpark Retirement Inn of Forrest City, and Evergreene Properties of North Carolina, L.L.C., d/b/a Crestpark Retirement Inns—Crestpark Retirement Inn of Forrest City, Defendants.

No. 2:03 CV 00081 JLH.

United States District Court,
E.D. Arkansas,
Helena Division.

Sept. 2, 2004.

T. Robert Hill, Hill Boren, P.C., Jackson, TN, James J. Thompson, Jr., Nolan E. Awbrey, Hare, Wynn, Newell & Newton Birmingham, AL, Clark W. Mason,

Hare, Wynn, Newell & Newton, L.L.P., Little Rock, AR, for Plaintiff.

Fletcher Long, Jr., Butler, Hicky, Long & Harris, for Defendant.

## *OPINION AND ORDER*

HOLMES, District Judge.

Margarette Pannell Dooley alleges that her father, John Floyd Pannell, suffered injury and death as a result of negligent care and treatment that he received while he was a resident of Crestpark Retirement Inn of Forrest City ("Crestpark"). Crestpark is a nursing home owned by Cap–Care of Arkansas, Inc. ("Cap–Care") and operated by Evergreene Properties of North Carolina, L.L.C. ("Evergreene"). Crestpark is located in Forrest City, Arkansas, a city located approximately 45–50 miles west of Memphis, Tennessee. Forrest City has a population of almost 15,000, according to the 2000 Census. *See* U.S. Census Bureau, 2000 Census of Population and Housing, *Population and Housing Unit Counts*, PHC–3–5, Arkansas.

Pannell was admitted to Crestpark on July 19, 1999. He died on February 12, 2000. One of Dooley's experts, Gerald Gowitt, M.D., states that Pannell's death was caused by the stress of pressure sores and associated infections. Defendants' brief states that Pannell "died from pneumonia which probably resulted from multiple decubitus ulcers."[1] Testimony from Dooley's witnesses also indicates that Crestpark lacked adequate supplies and was often understaffed, that Pannell often was not turned at appropriate intervals and was frequently found soiled or wet, and that, during the time of his stay at Crestpark, Pannell suffered dehydration and malnutrition.

Cap–Care and Evergreene have moved for summary judgment. Both Defendants argue that Dooley cannot meet her burden of proving the elements of a medical malpractice action, as defined in Ark.Code Ann. § 16–114–206, because she lacks the expert testimony necessary to prove the degree of skill and learning ordinarily possessed and used by long-term care facilities in Forrest City, Arkansas, or a similar locality. Cap–Care separately contends that it did not owe Pannell a duty in either tort or contract because it merely leased the property to Evergreene and neither exercised nor had the authority to exercise control over the actions alleged in Dooley's complaint.

A court should grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis of its motion and identifying the portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Group Health Plan, Inc. v. Philip Morris USA, Inc.,* 344 F.3d 753, 763 (8th Cir.2003). When the moving party has carried its burden under Rule 56(c), the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S.

---

1. A decubitus ulcer is a pressure sore.

574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1985) (quoting Fed.R.Civ.P. 56(c)). The non-moving party sustains this burden by showing that "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. When a non-moving party cannot make an adequate showing on a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. In deciding a motion for summary judgment, the court must view the facts and inferences in the light most favorable to the party opposing summary judgment. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir.2001). If the evidence would allow a reasonable jury to return a verdict for the non-moving party, summary judgment should be denied. *Derickson v. Fidelity Life Assoc.*, 77 F.3d 263, 264 (8th Cir.1996).

■ At the time in question, the Arkansas Medical Malpractice Act stated that in any action for medical injury the plaintiff had the burden of proving: "1) the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he practices or in a similar locality; 2) that the medical care provider failed to act in accordance with that standard; and 3) that as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred." Ark.Code. Ann. § 16–114–206(a).[2] The statutory definition of "medical care provider" includes a nursing home engaged in providing profession-

al medical care or services. Ark.Code Ann. § 16–114–201(2). Arkansas law, which is applicable here, requires that the standard of care in a medical malpractice case be established by expert testimony when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge. *Hall v. Arthur*, 141 F.3d 844, 847 (8th Cir.1998); *DeWitt v. Brown*, 669 F.2d 516, 520 (8th Cir.1982); *Jeanes v. Milner*, 428 F.2d 598, 601 (8th Cir.1970).

The issue of whether Dooley can establish the elements of a medical malpractice case concerns the proposed testimony of Susan Gilbert, R.N., who apparently is the witness upon whom Dooley relies to provide the required expert testimony. Gilbert is a nurse practitioner in Olive Branch, Mississippi. Olive Branch is in northern Mississippi, some 15 miles southeast of Memphis, Tennessee. Its population is slightly more than 21,000, according to the 2000 Census. *See* U.S. Census Bureau at PHC–3–26, Mississippi. In her deposition, Gilbert testified that she graduated from Mississippi University for Women "with a master's degree in nursing and as a family nurse practitioner." She has worked as a nurse and as a director of nurses in facilities in Alabama and Memphis, Tennessee. She also has practiced in Olive Branch. She has reviewed thirty-five to forty-five cases as a consultant, always for the plaintiff. The transcript of Gilbert's deposition contains the following questions and answers:

Q. Now, are you familiar with the standards as far as long-term facility care that exist in St. Francis County, Arkansas?

2. The statute was amended effective March 25, 2003, by § 18 of the Civil Justice Reform Act of 2003, 2003 Ark. Laws Act 649. No party in this action has contended that the 2003 amendments control this case.

A. I'm familiar with the Arkansas regulations.

* * *

Q. Do you know what the standard of care in a nursing home, long-term facility is in eastern Arkansas?

A. Yes, sir.

Q. And tell me how you are familiar with that.

A. Well, I'm familiar with that through the federal guidelines, which are regulating the standards in nursing homes across the nation.

Q. And I understand . . . you said that . . . you take charts and you look at them with the federal guidelines on nursing home care in mind.

A. Yes, sir.

Q. And you've just told me that you look at them with the Arkansas regulations on long-term care in mind.

A. No, sir, I said I have familiarized myself with those regulations.

Q. So when you are looking in a chart to determine whether the care was substandard or not . . . your opinion is based on whether it met the federal guidelines or not?

A. Yes, sir.

Q. Is your opinion in any way related to your knowledge of what the standard of care in this case in St. Francis County, Arkansas, is?

A. I do look at the policies and procedures of the facility, you know, to also guide my opinions, but I don't know—maybe you need to re-ask me. Are you asking me did I—was I utilizing the Arkansas standards to form my opinions?

Q. Well, generally, are you familiar with the standard of care for nurses in nursing home facilities in eastern Arkansas in 1999 and the year 2000?

A. I'm familiar with the Arkansas regulations, and I'm also familiar with their policies and procedures.

* * *

Q. But before we leave this issue, I want to make sure I understand one thing, that you are not familiar with what the standard of care for nurses in St. Francis County or the First Judicial District is in Arkansas?

A. I feel like I'm familiar in respect to the policies and procedures that they use in their community to guide their standards, also with the use of the federal standard guidelines, which govern—or maybe that is the wrong word—which all nursing homes use throughout our country in order to note standards in long-term care facilities. And the federal standards are across the board.

* * *

A. I feel like that I'm qualified to speak to nursing standards of care in Arkansas based on the things we've discussed here today. . . .

* * *

Q. Okay. What is your familiarity with standards of care for nurses or physicians practicing in or around St. Francis County, Arkansas, other than the federal guidelines?

A. There are state guidelines and their policies and procedures for that particular area.

Q. Okay. So your familiarity would be with federal guidelines?

A. Yes, sir.

Q. The state guidelines?

A. Yes, sir.

Q. And the policies and procedures of the facility?

A. Yes, sir.

Q. Anything else?

A. Not to my knowledge.

In summary, Gilbert testified that she is familiar with the standard of care for nursing homes in eastern Arkansas and that her familiarity with that standard of care is based upon her knowledge of federal guidelines that nursing homes all across the country follow, her knowledge of the Arkansas state regulations governing long-term care, and her knowledge of the policies and procedures of the facility. Defendants construe Gilbert's testimony to say that she did not know the standard of care for Forrest City, Arkansas, or similar localities, and that she only knew the guidelines for nursing homes participating in the Medicare program, but the Court does not read her testimony that way.

■ In view of Gilbert's education and experience, which includes practice less than two hours from Forrest City in a comparable-sized city of an adjoining state, and in view of her testimony regarding her familiarity with standard of care in eastern Arkansas, the Court cannot say at this stage of the case that Gilbert lacks the knowledge to testify to "the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he practices or in a similar locality" or that "the medical care provider failed to act in ac-

cordance with that standard." Ark.Code Ann. § 16–114–206(a). *Cf. Riley v. Layton,* 329 F.2d 53, 56–57 (10th Cir.1964); *Dickens v. Everhart,* 284 N.C. 95, 100, 199 S.E.2d 440, 443 (1973); *Kirchner v. Dorsey & Dorsey,* 226 Iowa 283, 284 N.W. 171, 177 (1939).[3] Gilbert seemed to say that nursing homes in Forrest City and similar localities ordinarily possess and use, at a minimum, the degree of skill and learning prescribed by the guidelines for nursing homes that participate in the Medicare program. *Cf. DeWitt v. Brown,* 669 F.2d at 521–22. Testimony to that effect would satisfy the Arkansas Medical Malpractice Act, not because those guidelines create a private right of action or a national standard of care but because such testimony would show, at a minimum, the degree of skill and learning used by nursing homes in Forrest City or a similar locality. Secondly, Gilbert testified that she is familiar with the Arkansas regulations. It seems likely that nursing homes in Forrest City or similar localities ordinarily possess and use, at a minimum, the degree of skill and learning required by the regulations issued by the Office of Long–Term Care of the State of Arkansas. *Cf. Johnson v. Hillcrest Health Center, Inc.,* 70 P.3d 811, 817–18 (Okla.2003). It may be that nursing homes in a given locality ordinarily possess and use a higher degree of skill and learning than prescribed for participation in the Medicare program or required by the Arkansas regulations, in which case the standard of care in that locality would be higher than those guidelines and regulations prescribe. Gilbert also testified that she was familiar with the facility's policies and procedures. Cap–Care and Evergreene

---

**3.** All of these cases were cited with approval in *Gambill v. Stroud,* 258 Ark. 766, 770–B, 531 S.W.2d 945, 950 (1976). Cases on the locality rule are collected in James Duff, Jr., Annotation, *Malpractice Testimony: Compe-*

*tency of Physician or Surgeon from One Locality to Testify, in Malpractice Case, as to Standard of Care Required by Defendant Practicing in Another Locality,* 37 A.L.R.3d 420 (1971).

had entered into a Management Services and Operating Agreement, quoted *infra*, which indicates that these policies and procedures were designed to be consistent with the standards of practice for good quality nursing care in Arkansas. Taking all of this into account, the Court cannot say that the Defendants have met their burden of showing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Cf. Pearce v. Cornerstone Clinic for Women,* 938 F.2d 855, 859–60 (8th Cir.1991).

As a separate argument for summary judgment, Cap–Care asserts that it leased the facility to Evergreene and was not involved in the operation of Crestpark or responsible for the care of Pannell. Cap–Care submitted an affidavit that states, "Cap–Care had nothing to do with the operation of Crestpark Retirement Inns, or with the employment of or supervisions [sic] of any of the employees who worked at Crestpark Retirement Inn." With that affidavit, Cap–Care submitted an agreement entitled "Management Services and Operating Agreement," dated April 1, 1999, and a superseding agreement dated October 1, 1999, which, for present purposes, is identical to the April 1 version. In that agreement, Evergreene assumed management of eight long-term care facilities owned by Cap–Care in Arkansas, including the one in issue. The agreement identifies Cap–Care as the "Owner" and Evergreene as the "Operator." One of the responsibilities of Evergreene, as the Operator, was described in the agreement as follows: "Develop policies and procedures for each department and service of the facility as required by the Office of Long–Term Care rules and regulations and federal regulations for nursing home facilities." Another of Evergreene's duties was to "[a]ssure the continuing good standing of all long term care facility licenses and Medicare and Medicaid certifications...."

Still another was "[t]o periodically observe the level of care provided by each nursing home facility, and ensure the same is consistent with the standards of practice for good quality nursing home care in the state of Arkansas." At the conclusion of the list of responsibilities of the Operator, the Management Services and Operating Agreement stated:

> Notwithstanding the above statement of management and operation activities, the terms and conditions of this Agreement shall not be construed to change the ownership designation for licensure purposes. The Owner, subject to the limitations set forth herein as responsibilities of the Operator, is the decision maker for matters related to the management and operation of the eight (8) long-term care facilities.

■ In view of the provisions of the Management Services and Operating Agreement, the Court cannot find that Cap–Care has met its burden under Rule 56 of establishing the absence of a genuine issue of material fact as to whether it was involved in the operation of Crestpark or responsible for the care of the residents. *Cf. Foster v. Johns–Manville Sales Corp.,* 787 F.2d 390, 393 (8th Cir.1986). Absent further explanation, the affidavit submitted by Cap–Care does not seem consistent with the provision of the Management Services and Operating Agreement quoted immediately above. That provision says that Cap–Care, in some measure not fully explained, "is the decision maker for matters related to the management and operation of the eight (8) long-term care facilities." In view of the apparent conflict between the affidavit and the agreement, a genuine issue of material fact exists as to whether Cap–Care was involved in the operation of Crestpark and responsible to some extent for patient care.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Docket # 12) is DENIED.